ROBERT G. DREHER
Acting Assistant Attorney General
Environment & Natural Resources Division
JULIA S. THROWER
Attorney
United States Department of Justice
Environment & Natural Resources Division
301 Howard Street, Ste. 1050
San Francisco, CA 94105
Tel: (415) 744-6566

MICHAEL C. ORMSBY
United States Attorney
RUDY VERSCHOOR
Assistant United States Attorney
920 W. Riverside Avenue, Ste. 340
Spokane, WA 99201
Tel: (509) 353-2767

Attorneys for Defendant


IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| THE LANDS COUNCIL; HELLS CANYON PRESERVATION COUNCIL; and LEAGUE OF WILDERNESS DEFENDERS – BLUE MOUNTAINS BIODIVERSITY PROJECT,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES FOREST SERVICE,<br><br>Defendant. | Case No. CV-12-619-LRS<br><br>**MEMORANDUM IN RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT** |

COMES NOW Defendant United States Forest Service, by and through its

counsel of record, and hereby responds to Plaintiff's Motion for Summary

1  Judgment, and pursuant to Federal Rules of Civil Procedure 12(b)(6) and 56, hereby

2  seeks an order dismissing the above-captioned action in its entirety.

## I. INTRODUCTION

The Forest Service completed an exhaustive review of the environmental impacts of the South George Vegetation and Fuels Management Project ("South George Project" or "Project"). Despite this comprehensive review, Plaintiffs challenge the Project under the National Forest Management Act ("NFMA") and the National Environmental Policy Act ("NEPA") based on unsubstantiated claims that the Project fails to provide for viable populations of primary cavity excavators because it removes too many snags in a small patch of dry upland forest, that the Project impermissibly authorizes "logging" in protected riparian areas, and that the Forest Service fails to take a hard look at the impacts to potential wilderness areas.

First, Plaintiffs fail to demonstrate how the Project will cause a loss in viability in primary cavity excavators in dry upland forest, let alone the applicable analysis area—the Umatilla National Forest. Second, Plaintiffs attempt to impose the wrong standard to fuel management activities that occur in riparian areas and are confused on which stream Project impacts will occur. Once the appropriate standard is applied to the correct stream, the record demonstrates that the Project complies with the relevant requirements.[1] Finally, Plaintiffs have not demonstrated that the Forest Service analysis was inadequate, or its conclusion arbitrary, that no

_____

[1] AR 7694 defines "Prevent attainment of RMOs" as to "preclude attainment of habitat conditions that meet RMOs. Permanent or long-term modification of physical/biological processes or conditions that determine the RMO feature would be considered to prevent attainment of RMOs."

potential wilderness areas exist in the South George Project Area. As explained below, the South George Final Environmental Impact Statement ("Final EIS") and Record of Decision fully comply with NFMA and NEPA. The Forest Service is entitled to summary judgment on all claims.

## II.   BACKGROUND FACTS

The Umatilla National Forest ("Forest") encompasses approximately 1.5 million acres, mostly in Oregon and a small portion in Washington. AR 3045. Analysis of the existing and historical conditions indicates that the upland forests current conditions are contributing to their impaired health and deteriorating ecosystem integrity. AR 29085. Dry upland forest sites support an unbalanced species composition, have too much understory, and are too dense. *Id.* The moist upland forests also have similar concerns. AR 29085-86. These conditions have caused well above normal levels of insect and disease and a departure from historically mixed-severity fire regimes to one characterized by high fire severity. AR 29086.

The South George Project proposes to conduct timber harvest and fuel reduction activities on 3,900 acres of upland forests in the Umatilla National Forest. AR 29090. The Project's purpose, in part, is to manage vegetation to return stands to conditions closer to their historic character and improve stand health and vigor, reduce the risk of catastrophic wildfires, and increase resilience to insect attack by reducing stand density. AR 29086. The vast majority of the stand treatment would be intermediate cutting, consisting of 3,020 of improvement cutting and 80 acres of low thinning. *Id.* Of the 3,900 acres to be treated with some type of timber harvest, 926 acres are found in the dry upland forest stands, and the remaining 2,974 acres are found in moist upland forest stands. Of that 926 acres of dry forest being

treated, 98.8 acres will be treated using the seed tree method (resulting in the creation of a new stand of trees) while 826.9 acres would be treated using improvement cutting, which maintains minimum stocking levels from the Forest Plan.  AR 29273; *see also* AR 29440-29444 (Table B-2).

## III.    STATUTORY BACKGROUND

### A.    The National Forest Management Act ("NFMA")

Administration of the National Forest System is chiefly governed by NFMA. 16 U.S.C. §§ 1600-1614.  Forest planning under NFMA is carried out in two stages. *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 728-32 (1998).  The first level is embodied by the forest plan, which is a broad, programmatic document. *Id.* at 729-30; 16 U.S.C. § 1604.  At the second level, the Forest Service undertakes site-specific actions to achieve the desired conditions in the forest plan. *Ohio Forestry*, 523 U.S. at 729-30.  Proposed projects must be consistent with the forest plan. *See* 16 U.S.C. § 1604(i).

In 1995, the Umatilla National Forest Plan was amended by the Interim Strategies for Managing Anadromous Fish-producing Watersheds in Eastern Oregon and Washington, Idaho, and Portions of California ("PACFISH"). AR 9003.  PACFISH regulates land management activities in a way that will maintain or improve aquatic habitat.  AR 9012.  PACFISH establishes riparian management objectives and standards and guidelines for Riparian Habitat Conservation Areas that apply generally to all applicable forests until modified by site-specific information. *Id*.

### B.    The National Environmental Policy Act ("NEPA")

NEPA serves the dual purpose of informing agency decision-makers of the environmental effects of proposed federal actions and ensuring that relevant

information is made available to the public so that it "may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). NEPA does not mandate particular results or impose substantive environmental obligations on federal agencies. *Id.* at 351-52; *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989). Instead, NEPA ensures "that [an] agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Id.* NEPA requires the preparation of an environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment . . ." 42 U.S.C. § 4332(2)(C). In reviewing NEPA decisions, courts evaluate whether the analysis includes a "reasonably thorough discussion of the significant aspects of the probable environmental consequences." *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982) (internal quotation marks omitted).

**IV.    STANDARD GOVERNING REVIEW OF AN AGENCY DECISION**

Because the NFMA and NEPA do not provide a private right of action, a district court's review of an agency's final decision is reviewed under the Administrative Procedure Act ("APA"). 5 U.S.C. §§ 701-706; *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1013 (9th Cir. 2012). The APA imposes a deferential standard of review limited to the determination of whether the agency acted in a manner that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Forest Guardians v. U.S. Forest Serv.*, 495 F.3d 1162, 1168 (10th Cir. 2007) (citing 5 U.S.C. § 706(2)(A)). Review under the arbitrary and capricious standard 'is narrow, and [courts] do not substitute our judgment for that of the agency.'" *Earth Island Inst.*, 697 F.3d at 1013 (citing *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc)). "This

deference is highest when reviewing an agency's technical analyses and judgments involving the evaluation of complex scientific data within the agency's technical expertise." *League of Wilderness Defenders Blue Mountains Biodiversity Project v. Allen*, 615 F.3d 1122, 1130 (9th Cir. 2010) (citing *McNair*, 527 F.3d at 993), overrule on other grounds, *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009)).

The APA directs courts to "review the whole record or those parts of it cited by a party . . ." 5 U.S.C. § 706. Thus, the Court's review is limited to the administrative record before the agency decision-maker. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985). A reviewing court should only reverse an agency's decision as arbitrary and capricious when "the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *McNair*, 537 F.3d at 987 (internal quotations omitted).

## V. LEGAL ARGUMENT

### A. The Forest Service Did Not Violate the NFMA.

Consistent with the best available science, the Forest Service did an extensive analysis of historical and current snag density conditions within the South George Project Area, and designed the Project to provide sufficient snag densities for primary cavity excavator habitat. The Project does not threaten primary cavity excavator viability (AR 29273-74) despite a slight decline in snag density in the Project Area. Plaintiffs' claim that the Forest Service cannot maintain viability because there is currently insufficient snag density in a portion of the Project Area

and the Project further reduces snag numbers is unsubstantiated. First, Plaintiffs apply the "viability requirement" to the wrong scale. Second, Plaintiffs' misinterpret the analysis and discussion in the Final EIS. They incorrectly conclude that there are an insufficient number of snags in dry forests to maintain viability. Third, Plaintiffs wrongly presume that any decrease in the snag density must result in a loss of viability. Plaintiffs are wrong on all counts. The Project provides for primary cavity excavator viability and complies with NFMA. AR 29273-74. Plaintiffs' summary judgment motion should be denied.

      1.    The Viability Requirement Applies Forest-wide.

      Throughout their memorandum, Plaintiffs assume that the viability requirement found in the 1982 NFMA regulations applies to the Project, and further assume the requirement must be met at the Project scale. *See, e.g*., ECF No. 22. at 13 ("The Forest Service, failed to provide for viable populations of primary cavity excavators that use large snags in dry forest."). The "viability requirement" was found in 36 C.F.R. §219.19 (1982), which provided that "[f]ish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area." The regulations were superseded in 2000, *see* 65 Fed. Reg. 67,514 (Nov. 9, 2000), codified at 36 C.F.R. pt. 201 (2010), and the viability requirement "appl[ies] only to the extent they were incorporated into the Forest Plan." *Ecology Center v. Casteneda*, 574 F.3d 652, 657 (9th Cir. 2009).[2] The plain language of the regulation and the Forest Plan both demonstrate that the 1982 NFMA viability requirement applies forest-wide, and not to a site-

---

[2] The 2000 planning regulations have themselves been superseded by regulations promulgated in 2012. *See* 77 Fed. Reg. 21162 (Apr. 9, 2012).

specific project area.  The regulations defined "minimum viable population" as "one which has the estimated numbers of reproductive individuals to insure its continued existence is well distributed in the <u>planning area</u>."  36 C.F.R. § 219.19 (emphasis added).  Those regulations defined "planning area" as "[t]he area of the National Forest System covered by a regional guide or forest plan."  *Id.*. § 219.3.  Thus, the regulations governing the maintenance of viable populations is directed at the entire Umatilla National Forest, the area of the National Forest System covered by the Umatilla National Forest Plan.

Moreover, even if the Umatilla Forest Plan incorporated the viability requirement for primary cavity excavators, it did so at the planning, and not project, level.  *See* AR 5171 ("[A]s a minimum, provide the required numbers and sizes of hard snags <u>throughout the Forest</u> to maintain primary cavity excavators at 40 percent of their potential population <u>throughout their present range</u>.") (emphasis added); *see also Earth Island Inst.*, 697 F.3d at 1014-15 (holding that if Lake Tahoe Basin Management Unit Forest Plan incorporated the 1982 regulations, species monitoring requirements were incorporated at the planning level); *Earth Island Inst, v. Carlton*, 626 F.3d 462, 470-71 (9th Cir. 2010) (requirement "pertains to the planning area, not the project area at issue").  Moreover, the Forest Plan dictates that any viability requirement for primary cavity excavators is met through providing a sufficient number of snags throughout the planning area, and not by monitoring population levels.  *See* AR 5171.  Thus, there is no requirement to provide for viability at the project level.  As explained below, whether or not the 1982 viability requirement applies, the record demonstrates that the Forest Service satisfied the requirement to provide sufficient snag habitat at the Forest-wide level to maintain viable populations.

2. <u>The Forest Service Used Best Available Science to Ensure a Sufficient Number of Snags Would Be Retained in the Project Area For Primary Cavity Excavators.</u>

The Project proposes to retain 3 snags per acre in harvest units located within dry forest habitat. AR 29269; AR 29273. Plaintiffs claim that the Project cannot provide for viable populations of primary cavity excavators because it cannot provide for 3 snags per acre throughout the entire dry forest area that currently averages 1.1 snags per acre. ECF No. 22 at 16. Plaintiffs also argue that the Project will also threaten viability because it will further reduce the number of snags in dry forest by removing snags greater than 21 inches dbh ("large snags"), thinning green trees that might become future snags, and reducing snags through the use of prescribed burning. ECF No. 22 at 17. Plaintiffs are incorrect.

a. <u>The Project retains sufficient snag density to maintain adequate habitat for primary cavity excavators Forest-wide.</u>

In 1995, the snag retention standards of the Umatilla Forest Plan were amended by the Revised Continuation of Interim Management Direction Establishing Riparian, Ecosystem and Wildlife Standards for Timber Sales ("Eastside Screens"), which directs the Forest Service to use best available science to maintain snags and green replacement trees greater than 21 inches diameter at breast height ("dbh") at 100 percent potential population levels of primary cavity excavators. AR 9486; AR 9543. The Forest Service applied methods consistent with the best available science in Rose, *et al.* (2001) to determine a reasonable number of snags that harvest units in the South George Project should leave to provide habitat for primary cavity excavators. AR 29269; *see also* AR 25853

(stating that the Project does "not rely on current forest plan snag and down wood standards").

Consistent with methodology described in Rose, *et al.*, AR 14626-30, the Forest Service used current vegetation survey ("CVS") data from the Asotin Watershed, *see* AR 25317-349, and snag data in the Decayed Wood Advisor ("DecAID") that was collected from unharvested areas over the entire Blue Mountains to compare the current and historical[3] (or reference) snag density and distribution in the Project Area by both forest vegetation group and snag diameter.[4] *See* AR 29269; *see also* AR 29270-72 (Figures 3-8 – 3-11). For the dry forest vegetation group, the comparison of historical and current snag density and distribution demonstrates that there currently are "areas with higher snag densities than reference conditions on a small percent of dry forest" while the amount of dry

_____

[3] Historical conditions are determined by looking at the historical range of variation, which uses reference conditions pertaining to the pre-settlement era—the mid-1800s for the northern Blue Mountains. AR 29058-59. Here, the reference condition was determined from data from unharvested areas, which is comparable to the historical conditions. AR 29269.

[4] The Forest Service also utilized other methodologies recommended by Rose, *et al.*, such as considering the fall rate of snags, the rate at which green trees would reach certain diameters and function as replacement snags, and implementation of monitoring of snag and live tree habitats. *See* AR 14629 (Rose et al, 2001); AR 7275-79 (Interim snag guidance); AR 29123-24 (FEIS – Project Design Features and Management Requirements); AR 5319 (Forest Plan Monitoring for Dead and/or Defective Tree Habitat).

forest with lower large snag density is "about 50% below expected under natural conditions." AR 29269; *see also* AR 29270 (Figures 3-8 and 3-9). "[A]reas with higher snag densities than reference conditions . . . likely reflects patchy past insect and disease infestations that occurred in the 1980s and early 1990s." AR 29269.

Plaintiffs argue that it is not possible for the Project to provide for an average of 3 snags per acre when only 1.1 snags per acre exist on average in dry forest. ECF No. at 16. But the Project does not propose to provide 3 snags per acre for the entire dry forest land (2,950 acres). Rather, it proposes to retain a minimum of 3 snags per acre in dry forest harvest units. AR 29269; AR 29273. And it does not need to do more order to provide adequate snag habitat. First, the reference conditions show that historically there was a large amount of dry forest land in the Project Area with no large snags per acre, and the current amount of dry forest land in the Project Area with no snags per acre is close to the reference conditions.[5]

_____

[5] The difference between 80 percent and 75 percent of land with no snags per acre may not be significant, given that determination of reference conditions (condition in the distant or historical past) are limited by lack of historical data, difficulties in interpreting the historical record, and societal limitations. AR7596 (Morgan et. al. 1994). Because determination of the historical range of variability depends on the selection of the spatial and temporal scales (AR7592-93), and because development of any particular stand of trees may progress over several hundred years, a variability of five (5) percent in the acreage within a watershed having zero snags may mean little. Plaintiffs' alarm over a five percent range of variability seems unwarranted (and certainly lacks adequate foundation) when one considers what HRV encompasses and the limitations of accurately determining HRV.

AR29269; AR29270 (Figure 3-9). Notably, the amount of dry forest with no snags per acre will not increase after Project implementation. AR29273. Thus, the amount of dry forest with no snags per acre after Project implementation will remain within the historical range. Second, as explained above, there is currently an overabundance of acres in dry forests with high large snag densities (>4 snags/acre), and a deficit of acres with less than 4 large snags per acre as compared to the reference condition. AR 29269; AR 29270. The Project may lead to a more natural distribution of snags by increasing the number of acres with 2-4 snags per acre by removing some large snags, but retaining a minimum of 3 large snags per acre in harvest units. AR 29273. "Managing forests within or toward the historical range of variability should provide habitat for primary cavity excavators." AR 29273. Third, the reference condition shows that there is a wide range of snag densities in the Project Area. AR29268, *see also* AR 29270-72. Thus, even if the Forest Service could provide 3 snags per acre in the entire dry forest area, it would not be desirable to do so.

In addition to moving the large snag density and distribution in dry forest area toward its historical condition, the Project leaves smaller diameter snags (10 to 19 inches dbh) that are also used by primary cavity excavators, retains "all functioning snag habitat (broken top, signs of excavation, etc) . . . wherever possible," and leaves most large trees (>21 inches dbh) as part of the replacement tree stock for future snag development. AR 29269; AR 29273.

The Forest Service also analyzed snag density and distribution at the Watershed level, differentiating between three potential vegetation groups and diameter classes. AR 29269 (Table 3-69). The South George Project also evaluated snag distribution Forest-wide, using 1992 and updated 2002 data. AR 23292. The

analysis shows that the Project will provide snag habitat suitable for primary cavity excavators.

        b.    The Project will not cause a significant reduction in future snags due to thinning or prescribed burning.

The Final EIS demonstrates that the Project is designed to provide for a sufficient number of future snags so as to satisfy the Forest Plan and NFMA. Plaintiffs first argue that the Project will harvest large trees (>21 inches dbh) in dry forest and that thinning activities will reduce the number of trees that might otherwise become future snags. ECF No. 22 at 17. But the silvicultural prescriptions[6] calls for retaining most large trees and leaving overly dense stands in a "fully stocked" condition. AR 29273. While some green trees will be removed, the fully stocked stands, which meets snag replacement objectives, will provide a sufficient number of trees that could become snags in the future. AR 29273. In *Casteneda*, the Ninth Circuit held that the Forest Service did not violate NFMA by counting acres toward the forest plan old growth standard which did not currently qualify as old growth but would grow in future replacement old growth. 574 F.3d at 662.

Plaintiffs also allege that prescribed fire will significantly reduce snag densities. ECF No. 22 at 18. While the threat to snag retention is slash piles (AR 29273) and prescribed fire may result in some snag loss, the Project is designed to minimize that loss. AR 29273 ("Slash from harvest within units will not be piled against snags to help reduce [snag loss]."); AR 29122 (same). Moreover, prescribed

---

[6] Thinning is an intermediate treatment whereby some trees are removed to modify the growth, quality, vigor, composition, or structure of a forest. AR 29107.

burning may create additional snags where it creeps into forested areas. *Id.; see also* AR 29249 ; AR 20332-38 (stating that prescribed fire is likely to kill some live standing trees [either within a treatment unit or at the unit's edge] and create snags as it is to destroy snags).

Thus, although the Plaintiffs allege that any reduction in snag density fails to satisfy NFMA, they provide no credible argument that the Project does not sufficiently provide for conditions to meet snag density and distribution characteristics to provide for primary cavity excavator habitat in the future.

3.    Viable Populations of Primary Cavity Excavators Will be Maintained Forest-wide.

Despite the fact that there may be a small decrease in snag numbers in harvest units, (AR 29273), the record demonstrates that the Project is moving the forest within or towards its historical conditions, which "should provide habitat for primary cavity excavators." AR 29273. All told, Plaintiffs' focus on 926 acres of dry forest that they allege will not meet the viability requirement ignores the contribution to habitat made throughout the Project Area, and over one million acres of forested land on the Umatilla National Forest that currently provides suitable habitat for primary cavity excavators. AR 29268 ("Forest-wide, snag densities are similar to reference values. This would indicate that overall available snag habitat is contributing to viable populations of primary cavity excavators."). The entire 3,900-acre Project "would affect less than 1 percent (0.006) of forested land on the

Umatilla National Forest."[7]  AR 29274.  The Project Area, including dry forest land, will still contribute to primary cavity excavator habitat by moving current conditions closer to historical ones despite the potential for some minor reduction in snag density in the Project Area.  AR 29273.  "That a proposed project involves some disturbance to the forest does not prohibit the Forest Service from assuming that maintaining a sufficient amount of suitable habitat will maintain a species' viability."  *McNair*, 537 F.3d at 997.  Thus it was entirely reasonable for the Forest Service to conclude that the "small negative habitat trend is too small to cause a change in primary cavity excavator population and continued viability is expected."  AR 29274.  Plaintiffs simply disagree with the Agency's conclusions, but that does not demonstrate a violation of NFMA.  Where resolution of such an issue requires a high level of technical expertise, the Court should defer to the informed discretion of the responsible federal agency.  *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 377 (1989); *Presidio Golf Club v. Nat'l Park Service*, 155 F.3d 1153, 1160 (9th Cir. 1998).  Summary judgment in favor of the Forest Service is warranted.

> **B.**    The South George Project Is Consistent With PACFISH, and Thus Complies With NFMA.

The South George Project is consistent with PACFISH standards and guidelines for fuel management projects in riparian areas.  Although the Project does allow non-commercial fuel and fire treatments in 25 acres of forest next to an unnamed tributary to George Creek, an area defined under PACFISH as a Riparian Habitat Conservation Area, such activities are allowed under PACFISH fuel

---

[7] Plaintiffs only argue that the Forest Service fails to provide for viability on 926 acres of dry forest.  ECF No. 22 at 18-19.  Thus, the percent of allegedly degraded habitat is even smaller.

management standard and guideline FM-1, so long as the management action does not prevent the attainment of Riparian Management Objectives.[8]  The Forest Service exhaustively analyzed the impacts of the Project on Riparian Management Objectives and reasonably found that the Project will not prevent their attainment. Despite this analysis, Plaintiffs challenge that conclusion.  Plaintiffs rely on the wrong standard and guideline, and misinterpret the data and analysis in the FEIS. Plaintiffs have failed to demonstrate how the Project is inconsistent with PACFISH and violates NFMA.  Their motion for summary judgment as to this claim should therefore be denied.

> 1.  PACFISH  Allows Fuel Management Activities to Proceed In Riparian Habitat Conservation Areas Where the Activity Will Not Prevent the Attainment of Riparian Management Objectives.

PACFISH provides federal land managers guidance to protect and restore anadromous fish-producing watersheds.  It does not prohibit timber projects and activities within Riparian Habitat Conservation Areas.[9]  Rather, PACFISH provides

---

[8] PACFISH defines "prevent attainment of [Riparian Management Objectives]" as to "preclude attainment of habitat conditions that meet [Riparian Management Objectives].  Permanent or long-term modification of physical/biological processes or conditions that determine the [Riparian Management Objective] feature would be considered to prevent attainment of [Riparian Management Objectives]."  AR7964.

[9] Riparian Habitat Conservation Areas are defined under PACFISH as "portions of watersheds where riparian-dependent resources receive primary emphasis." AR9107.  A riparian area is a "geographic area containing an aquatic ecosystem and the adjacent upland areas that directly affect it."  *Id.*

standards, guidelines, and procedures to follow for land management activities within Riparian Habitat Conservation Areas that may pose an unacceptable risk to anadromous fish stocks. AR 9053; *see also* AR9138.

First, PACFISH delineates riparian goals that "establish a common set of characteristics of healthy, functioning watersheds, riparian areas, and associated fish habitats." AR9045. Second, PACFISH establishes Riparian Management Objectives. Riparian Management Objectives are "measurable habitat parameters that together define good anadromous fish habitat and serve as indicators against which attainment, or progress toward attainment, of the goals can be measured." *Id.* There are six landscape-scale Riparian Management Objectives: (1) pool frequency; (2) water temperature; (3) large woody debris; (4) bank stability; (5) lower bank angle; and (6) width-depth ratios. AR 9135. PACFISH provides specific measures for each Riparian Management Objective that can be modified if warranted after a watershed analysis or specific stream data. AR 9134.

Finally, PACFISH establishes standards and guidelines for a variety of land management activities (e.g., timber, fire and fuels, roads, grazing, etc.) that provide management direction believed necessary to meet the riparian goals and Riparian Management Objectives. AR 9045; *see also* AR 9138-47 (list of standards and guidelines for various management activities). Land management projects, such as the South George Project, are entirely appropriate within Riparian Habitat Conservations Areas so long as they meet the applicable PACFISH standards and guidelines for a particular management activity.

> 2. The Forest Service Properly Applied PACFISH Standard FM-1 to the South George Project.

The Forest Service developed the Project applying PACFISH standard FM-1, so that the Project will not prevent the attainment of Riparian Management

Objectives. AR 29169 (stating the "fuels treatment would not be expected to prevent attainment or retard recovery of the water temperature"). The Forest Service properly applied this standard because the Project only proposes to do fire and fuels treatments within the Riparian Habitat Conservation Area.[10] Despite the Forest Service's disclosure in the FEIS of the purpose of the treatments in riparian areas and what standard it was applying, Plaintiffs insist that the South George Project violates PACFISH because it did not follow standards and guidelines for timber management (TM-1) or general riparian area management (RA-2). ECF No. 22 at 21. Plaintiffs, nonetheless, provide no credible argument as to why the TM-1 and RA-2 standards should be applied to the Project, or why the FM-1 standard was inappropriate in this case. *See Id.*at 21-27. The purpose of the South George Project is, among others, to "improve forest health, vigor, and resilience to fire, insects, and disease." AR 29060. The Project's vegetation treatments are designed to provide three fire-related benefits: (1) reduce fuel loading that would facilitate reintroduction of low-intensity fire into the ecosystem; (2) reduce ladder fuels to lower the risk of fire spreading into the canopy; and (3) reduce fuels that contribute to uncharacteristically high wildfire intensity and extensive resource damage. AR 29062; AR 29116.

Specifically within the Riparian Habitat Conservation Area, the Project proposes to non-commercially treat 25 acres of forest along a tributary to George Creek. AR 29168. The treatment removes trees from 4 to18 inches dbh along 0.6

---

[10] FM-1 allows fuel and fire treatments to occur in Riparian Habitat Conservation Areas as long as treatments are designed, so "as not to prevent attainment of Riparian Management Objectives, . . ." AR 9144.

miles of either side of the tributary, and is designed specifically to reduce the probability of crown fire initiation by treating ladder fuels, and reduce crown fire spread by disrupting the continuity of the upper canopy.[11]  AR 29168; AR 29487; AR 29791.  Notably, no harvest other than fuel treatments will occur within the 25-acre riparian area.[12]  AR 29118; AR 29170; AR 29487.

Plaintiffs provide no reason or rationale of why any PACFISH standards other than FM-1 should apply to the treatments proposed in Riparian Habitat

---

[11]  A crown fire is defined as a fire that spreads across the tops of trees or shrubs more or less independently of a surface fire.  Ladder fuels are combustible materials that provide vertical continuity between vegetation strata and allow fire to climb into the crowns of trees or shrubs with relative ease.  AR 10876-77.

[12]  The fact that the treatment is a "prototype to examine whether limited [Riparian Habitat Conservation Area] treatments are warranted or advisable in the future," AR 29448, is irrelevant to the inquiry of which PACFISH standard and guideline applies.  See ECF No. 22 at 23 n.8 (arguing that PACFISH does not permit "experimental logging or as a case study"); id. at 24 (same); id. at 25 n.11 (same). The relevant question as to whether the activity is allowed in Riparian Habitat Conservation Areas and under what conditions is what type of treatment is being applied (e.g., timber management, fire and fuels management, etc.).  See AR 9138-47 (listing standard and guidelines by management activity type).  The treatments here are clearly for fire and fuels management.

Conservation Areas under this Project.[13]  *See* ECF No. 22 at 21-27.  The Forest

Service disclosed the nature of the treatments along the tributary as specifically

designed to manage fire and fuels, and consistent with PACFISH requirements and

as explained below, designed the treatments so as to comply with this standard's

requirement to not prevent the attainment of Riparian Management Objectives.  The

Agency's application of the Forest Plan is subject to deference and should not be

second guessed by this Court.  *McNair*, 537 F.3d at 993.

        3.     <u>The Project Is Consistent With PACFISH Because It Will Not</u>
<u>Prevent the Attainment of Riparian Management Objectives For</u>
<u>Water Temperature.</u>

       The Project does not prevent the attainment of Riparian Management

Objectives, and thus is consistent with PACFISH and complies with NFMA.  *See*

AR 29168-175.  In particular, Plaintiffs argue that the Project will cause a

temperature increase in George Creek, a stream that is already out of compliance

with the Riparian Management Objective for temperature,[14] and will thus "retard . . .

attainment of the PACFISH [Riparian Management Objective] for temperature" and

violate NFMA.  ECF No. 22 at 26.  Plaintiffs are wrong.  Not only are they applying

the wrong standard, as discussed above, but they are misinterpreting the effects

analysis.

---

[13] Because TM-1 does not apply, the Forest Service did not need to "articulate[ ] a

reason why logging is 'needed to attain Riparian Management Objectives.'"  ECF

No. 22 at 24.

[14] The Riparian Management Objective for water temperature aims for "no

measurable increase in the maximum water temperature."  AR 9135.

As explained above, the proper PACFISH standard to apply to the Project is FM-1, which allows fire and fuel treatments in Riparian Habitat Conservation Areas where treatments do not "prevent the attainment of Riparian Management Objectives." AR 9144. The hydrology report and FEIS demonstrate that the Project will meet the Riparian Management Objective because it will not cause an increase in the temperature of George Creek. *See* AR 26798-806; AR 29168-175. Although the Project proposes to remove 20 percent of the basal area and reduce stand canopy closure by 10 percent within the Riparian Habitat Conservation Area of the tributary to George Creek, AR 29169, and although, as a result, the Project may slightly increase the temperature of the non-fish bearing tributary, the Project is not expected to impact the temperatures of George Creek for several reasons. First, the treatments are specially designed to limit shade reduction and follow best management practices for shade. AR 29168-69. For example, decline in canopy cover on the northwest facing, or shade-producing, slope will not exceed 10 percent, AR29118-121, thus, limiting any potential temperature increases. AR 29169.

Second, topographical and tributary features of the particular location, such as channel characteristics, and stream width and orientation, function such that any slight temperature increase in the tributary as a result of the treatments make it "unlikely that there would be a measureable water temperature increase in George Creek." AR29169. Mid-summer flows in the tributary, when peak stream temperatures occur, are low, and only make up about one-quarter of the total flows of George Creek at its confluence. AR 29169. Thus, there is a significant dilution effect. Furthermore, the tributary flows for one-quarter mile before draining into George Creek, and drains to the northeast where there is significant shade from vegetation. The area at the Forest boundary where the tributary drains into George

Creek has shown mid-summer water temperatures as low as 9° C (48.2° F), AR 29169, far below the mid-summer maximum average water temperatures of 56-64° F in George Creek.[15]  AR 29164.  This demonstrates that any slight temperature increase in the tributary is not likely to be felt in George Creek by the time the water reaches the confluence.

Based on the above analysis, was reasonable for the Forest Service to conclude that it is "unlikely that there would be a measurable water temperature increase in George Creek from [Riparian Habitat Conservation Area] fuels treatments" and the Project would not prevent or retard the attainment of Riparian Management Objectives.  AR 29169.  The Forest Service's analysis demonstrates that the Project is consistent with PACFISH standard FM-1, and thus complies with NFMA.  As such, no forest plan amendment is required to proceed with the Project. *See* ECF No. 22 at 27.

C.    The Forest Service Adequately Analyzed the Project Area For the Presence of Potential Wilderness Areas in Compliance With NEPA.

The Forest Service adequately analyzed the Project Area for the possible presence of potential wilderness areas, and reasonably determined that none were present.  Plaintiffs argue that had the Forest Service not arbitrarily excluded 300-foot roadside buffers that allegedly contain unique unforested areas in determining potential wilderness areas, it "would most likely put the South Fork Asotin Creek roadless area above 5000 acres," thus automatically making it a potential wilderness

---

[15]  Temperatures are seven-day summer maximum averages from 1992-2003.  AR 29164.

area under the inventory criteria.[16]  ECF No. 22 at 30.  Plaintiffs are incorrect for two reasons.

Using a series of map overlays containing data regarding Inventoried Roadless Areas, designated Wilderness areas, forest roads, and areas of past harvest, the Forest Service determined the size and location of areas within the Project Area that were undeveloped, and thus could possibly qualify under the inventory criteria for a potential wilderness area.  *See* AR 29497-521.  Because road maintenance, such as brush clearing and hazard tree removal, occurs that creates "stumps that are evident and recognizable, the Forest Service excluded a 300-foot roadside buffer[17] from the undeveloped lands acreage."  AR 29499; *see also* AR 29508, 29513-514.  The Forest Service recognized that "stumps are not present along every mile of

---

[16]  The Forest Service Handbook ("FSH") lists inventory criteria for potential wilderness.  *See*  FSH 1909.12, Ch. 71, § 71.1.  To be considered a potential wilderness area, undeveloped areas  (i.e., areas without evidence of past harvest and without presence of roads), AR 29502, must either (1) contain 5,000 acres or more; or (2) contain less than 5,000 acres and meet at least one of three criteria, such as being a self-contained ecosystem.  FSH 1902.12, Ch. 71, § 71.1.  All undeveloped areas identified in the Project Area, other than the South Fork Asotin Creek area, contained significantly less than 5,000 acres.  AR 29502-506.  Therefore, the inclusion of the 300-foot roadside buffer into these areas would not increase the acreage to 5,000 acres or more.  In addition, the areas do not meet the inventory criteria.  *See* AR 26364-66.

[17] The buffer is 300 feet on each side of the road.  AR29499; AR 29508; AR 29513-514.

forest roads," but with its local knowledge and professional judgment regarding the extent stumps occurred along forest roads, "and to facilitate easy on-the-ground identification of a uniform, measurable boundary along a semi-permanent human-made feature," the Forest Service set the boundary for each road in the Project Area. AR29499. This method is consistent with procedures in the FSH to remove from the calculation of potential wilderness areas acreage attributed to Forest roads and acreage with evidence of past logging, and to set boundaries "to facilitate easy on-the-ground identification." AR 29500; *see* FSH 1909.12, Ch. 71, § 71. The Agency's actions did not fail to account for relevant features and were not arbitrary and capricious.

Furthermore, Plaintiffs have not demonstrated how even inclusion of <u>all</u> 300-foot roadside buffer acreage would have pushed the South Fork Asotin Creek area above the 5,000-acre threshold for identification as a potential wilderness area. Moreover, based on Forest Service Handbook direction, the Forest Service delineated the South Fork Asotin Creek area boundaries by "locat[ing] boundaries at prominent natural or semi-permanent human-made features to facilitate easy on-the-ground identification." AR 25746-748. This excluded several narrow fingers of land that surrounded Forest roads that would have made administration of the potential wilderness area difficult, and thus reduced the potential wilderness area to only 3,310 acres (as compared to the estimated 4,440 acres). *See* AR 29518. Thus, even adding all of the roadside buffer would have made no difference.

The Forest Service considered that all roadsides may not have past evidence of harvest but concluded that that roadside buffer should be applied to all roads in the Project Area to facilitate easy on-the-ground identification. AR 29499. The Forest Service adequately disclosed its decision, and this decision is entitled to

deference. *McNair*, 537 F.3d at 993. The Court should find in favor of the Forest Service on Plaintiffs' NEPA claim.

      D.    <u>Summary Judgment in Favor of the Forest Service is Warranted On All Remaining Claims.</u>

In addition to finding in the Forest Service's favor as to the NEPA and NFMA claims discussed above, the Court also should rule that the remaining claims alluded to in the Complaint but not addressed in Plaintiffs' brief have not been adequately pled and have been abandoned. Judgment should be entered for the Forest Service as to all such claims.

In the Complaint (ECF No. 1), Plaintiffs alleged "the defendant has not maintained viable populations of pine marten, pileated woodpecker, northern three-toed woodpecker, or primary cavity excavators . . ." Plaintiffs also allege violations of PACFISH requirements related to grazing and recreation. ECF No. 1, ¶¶ 44-45. The allegations fail to plead sufficient facts to state a claim upon which relief may be granted.

The instant complaint is not pleaded with sufficient facts to state viable claims that are plausible on their face. The sum total of the allegations regarding viability of pine marten, pileated woodpecker, and three-toed woodpecker are:

> the defendant has not maintained viable populations of pine marten, pileated woodpecker, northern three-toed woodpecker, or primary cavity excavators . . .

ECF No. 1, ¶ 35. No other details regarding how the Forest Service failed to address viability for these three species is provided in the Complaint. All that is alleged in paragraph 35 is a legal conclusion insufficient under *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). The Court should dismiss the NFMA claims regarding pine marten, pileated woodpecker, and three-toed woodpecker, and

alleged violation of PACFISH standards for grazing and recreation.

Plaintiffs' motion for summary judgment addressed only a limited number of issues when compared to the Complaint in this matter. The remaining claims in the Complaint regarding viability of pine marten, pileated woodpecker, and three-toed woodpecker, and PACFISH requirements related to grazing and recreation should be considered abandoned because they were not addressed in Plaintiffs' motion for summary judgment. *Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667, 678 (1st Cir. 1995); *Head Start Family Educ. Program, Inc. v. Coop. Educ. Serv. Agency 11*, 46 F.3d 629, 635 (7th Cir. 1995); *Steeves v. City of Rockland*, 600 F. Supp. 2d 143, 173 n. 117 (D. Me. 2009) (citing *Grenier*, 70 F.3d at 678). Plaintiffs may not now rely on these claims. The Court should grant summary judgment to Defendant on the remaining claims.

## VI.    CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for summary judgment and grant Defendant's motion for summary judgment, and dismiss the case in its entirety.

Dated this 2nd day of August 2013.

ROBERT G. DREHER
Assistant Attorney General
Environment & Natural Resources Division
JULIA S. THROWER


s/Julia S. Thrower
Attorney
Attorney for United States Forest Service

MICHAEL C. ORMSBY
United States Attorney


s/Rudy J. Verschoor
RUDY J. VERSCHOOR
Assistant United States Attorney
Attorney for United States Forest Service


<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 2, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| Rick Eichstaedt: | ricke@cforjustice.org |
| Sean T. Malone: | seanmalone8@hotmail.com |
| Edward Joseph Bruya: | ebruya@kkbowman.com |
| Scott W. Horngren: | shorngren@amforest.org |
| Julia Sharon Thrower: | julie.thrower@usdoj.gov |

s/Rudy J. Verschoor
RUDY J. VERSCHOOR
Assistant United States Attorney