ROBERT G. DREHER
Acting Assistant Attorney General
Environment & Natural Resources Division
JULIA S. THROWER
Attorney
United States Department of Justice
Environment & Natural Resources Division
301 Howard Street, Ste. 1050
San Francisco, CA 94105
Tel: (415) 744-6566

MICHAEL C. ORMSBY
United States Attorney
RUDY VERSCHOOR
Assistant United States Attorney
920 W. Riverside Avenue, Ste. 340
Spokane, WA 99201
Tel: (509) 353-2767

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| THE LANDS COUNCIL; HELLS CANYON PRESERVATION COUNCIL; and LEAGUE OF WILDERNESS DEFENDERS – BLUE MOUNTAINS BIODIVERSITY PROJECT, | Case No. CV-12-619-LRS |
| Plaintiffs, | **MEMORANDUM IN REPLY TO PLAINTIFFS' RESPONSE TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| UNITED STATES FOREST SERVICE, | |
| Defendant. | |

COMES NOW Defendant United States Forest Service, by and through its counsel of record, and hereby submits its Memorandum in Reply to Plaintiffs' Response to Defendant's Cross-Motion for Summary Judgment.

## I. INTRODUCTION

Plaintiffs challenge the Forest Service's analysis of the environmental impacts from the South George Vegetation and Fuels Management Project ("South George Project" or "Project"), a project that will improve the forest health, vigor, and resilience to fire, insects, and disease and provide for sawlogs and wood products to regional and local industries. The Project aims to move the Umatilla National Forest ("Forest") toward the desired future conditions for species composition, structural diversity, stocking densities, and fuel loadings. Plaintiffs' objections to the Project are based on a misunderstanding of how the Project will meet the Umatilla National Forest Land and Resources Management Plan ("Forest Plan") requirements to provide for primary cavity excavator viability, confusion about which standards apply to Project treatments authorized in Riparian Habitat Conservation Areas, and disagreement with the methodology the Forest Service used to determine the presence of potential wilderness areas in the South George Project Area.

As shown in Defendant's opening brief, *see Def.'s Mem. Supp. Cross-Mot. Summ. J.*, ECF No. 31, and as set forth more fully below, Plaintiffs have not shown that there has been any violation of the law. The South George Project is consistent with the Forest Plan and its relevant amendments by providing sufficient protection to primary cavity excavators and adhering to the standards and guidelines of the Interim Strategies for Managing Anadromous Fish-producing Watersheds in Eastern Oregon and Washington, Idaho, and Portions of California ("PACFISH") to protect

the salient features of Riparian Habitat Conservation Areas. The Project therefore satisfies the National Forest Management Act ("NFMA"). In addition, the Forest Service complied with its obligations under the National Environmental Policy Act ("NEPA") by appropriately applying Agency-defined criteria for determining the presence of potential wilderness areas, and adequately disclosing its reasoning in the Project's Final Environmental Impact Statement ("FEIS"). Defendant is thus entitled to summary judgment on Plaintiffs' claims.

## II.    LEGAL ARGUMENT

A.    <u>The Forest Service Complied With NFMA Because the South George Project is Consistent With the Umatilla Forest Plan</u>.

1.    <u>Neither NFMA Nor the Forest Plan Require the Forest Service to Assess Viability at the Project Level.</u>

Defendant has demonstrated that both NFMA and its regulations, and the Forest Plan do not require the Forest Service to provide for species' viability at the project level. ECF No. 31 at 7-8. Plaintiffs continue to argue, despite the plain language of NFMA, its regulations, and related case law, that because NFMA requires site-specific projects to comply with the relevant forest plan, then the site-specific project itself, here the South George Project, must comply with the viability requirement at the project level. *Pls.' Combined Resp.-Reply to Fed. Def.'s Combined Mot. Summ. J. and Resp.*, ECF No. 34 at 2 (citing 16 U.S.C. § 1604(i)). Plaintiffs' argument is untenable and it must be rejected.

Defendant's opening brief demonstrates why Plaintiffs' interpretation of NFMA and its regulations is wrong. Defendant explained that, based on the plain language of the applicable NFMA regulation, the Forest Service is required to only "maintain viable populations . . . in the <u>planning</u> area," 36 C.F.R. § 219.19 (1982)

(emphasis added).[1]  ECF No. 31 at 7-8.  The regulations defined "planning area" as "[t]he area of the National Forest System covered by a regional guide or forest plan."  *Id.* § 219.3 (1982).  In the instant case, "the area of the National Forest System covered by a . . . forest plan" is the Umatilla National Forest.  Nowhere do those regulations indicate that the minimum viable population requirement applies to each site-specific project.

This interpretation of the 1982 viability requirement is consistent with Ninth Circuit cases that discuss the Forest Service's obligations under those standards as being only forest-wide requirements.  *See Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1069 (9th Cir. 2002) (discussing the 1982 regulations and "compliance with NFMA's <u>forest-wide</u> species viability requirements") (emphasis added); *see also Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1249-50 (9th Cir. 2005) (stating that the "Forest Service had a substantive duty under NFMA to ensure <u>forest-wide</u> goshawk viability before approving a project") (emphasis added); *Utah Envtl. Cong. v. Russell*, 518 F.3d 817, 821 (10th Cir. 2008) ("NFMA requires the Forest Service to develop broad directives for management of a give forest and to consider individual projects within the context of this <u>forest-wide</u> management plan.") (emphasis added). Thus, there is no duty to make a project level viability assessment.

Plaintiffs' reliance on *Native Ecosystems Council v. Tidwell*, 599 F.3d 926 (9th Cir. 2010), to suggest otherwise is misplaced.  In *Native Ecosystems Council*,

_____

[1] Although there are 2012 NFMA forest planning regulations, the Umatilla Forest Plan was developed under the 1982 NFMA planning regulations, which were incorporated into that Forest Plan.

the Ninth Circuit rejected the Forest Service's use of habitat as a proxy for analyzing a project's impacts to a species' population when the species did not occupy the project area. *Id*. at 933. But nowhere in that opinion did the court indicate that the 1982 viability standard was to be applied at the project level. Indeed, the only place where the opinion ever addresses the scale at which the viability requirement applies is when the court quotes the Beaverhead National Forest Plan which provides that "[v]iable populations of all existing wildlife species will be maintained by providing a diversity of habitats <u>throughout the Forest</u>." *Id*. at 932 (emphasis added). Moreover, in discussing the purpose of a forest plan, the Ninth Circuit recognized that "[t]he entire point of a forest-wide plan is that complying with its <u>forest-wide</u> standards will ensure <u>forest-wide</u> species and habitat preservation." *Id*. at 940 (emphasis added).

In addition, as Defendant demonstrated earlier, there is nothing in the Umatilla Forest Plan standard and guidelines that requires assessment of viability of primary cavity excavators at the project level. ECF No. 31 at 8. Specifically to primary cavity excavators that are at issue here, the Forest Plan provides that "[u]nless specified in management area direction, as a minimum, provide the required number of sizes of snags <u>throughout the Forest</u> to maintain primary cavity excavators at 40 percent of their potential population throughout their present range." AR 5171 (emphasis added). The Forest Plan FEIS also specifically describes the viability standard as applying to the planning area. AR 4567; AR 4573. There is no language to suggest that the Forest Service has to demonstrate that it is maintaining viable populations in the project area. In their response, Plaintiffs cite to specific management areas standards and guidelines in the Umatilla Forest Plan that they believe incorporate a viability duty at the project level, ECF

No. 34 at 4, but none of these provisions have the effect of project level standards or guidelines.

The Forest Service's interpretation of its Forest Plan is reasonable, indeed, more reasonable, than Plaintiffs'. For the Court to find that Plaintiffs' interpretation of the Forest Plan trumps the Forest Service's, the record must "plainly demonstrate[ ] that the Forest Service made a clear error in judgment in concluding that [the South George Project] meets the requirements of NFMA and the relevant Forest Plan." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 470 (9th Cir. 2010) ("*Carlton*") (citing *Lands Council v. McNair*, 537 F.3d 981, 993-94 (9th Cir. 2008) (en banc), *overruled on other grounds*). Plaintiffs have failed to make this showing. The Forest Service's interpretation of the Forest Plan is reasonable, and the Court must defer to that interpretation. *Ecology Ctr. v. Castenada*, 574 F.3d 652, 661 (9th Cir. 2009); *see also Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 962 n.8 (9th Cir. 2005) (agency's interpretation of its Forest Plan should be upheld unless "plainly erroneous or facially inconsistent with the Plan's language"); *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1098 (9th Cir. 2003) (decision can be overturned under NFMA only if "plainly erroneous or inconsistent with the Forest Plan").

Moreover, the Forest Service's interpretation of the Forest Plan is consistent with the Ninth Circuit's recent decisions in *Earth Island Institute v. U.S. Forest Service*, 697 F.3d 1010 (9th Cir. 2012) ("*Earth Island*"), and *Carlton*, in which the court held that forest plans with similar language to the Umatilla Forest Plan did not include a requirement to ensure species viability at the project level. In *Earth Island*, the Ninth Circuit held that even if the Lake Tahoe Basin Management Unit Forest Plan incorporated the 1982 regulations, any viability requirements "were

expressly incorporated only at the planning level rather than the project level." 697 F.3d at 1015-16. Likewise, in *Carlton*, the Ninth Circuit interpreted a provision of the 2004 Sierra Nevada Forest Plan Amendment that stated the plan would "provide habitat . . . necessary to maintain well-distributed viable populations . . . in the planning area" as "pertain[ing] to the planning area, not the project area at issue." 626 F.3d at 470-71. The logic in the *Earth Island* and *Carlton* cases, and the similarity of the Forest Plan language here, makes clear that this case must be resolved in the same way.

> 2. The FEIS Demonstrates That Primary Cavity Excavator Populations Will Be Maintained at the Forest Level.

Plaintiffs claim that even if the viability standard applies Forest-wide, the Forest Service failed to provide adequate habitat for primary cavity excavators because it cannot provide 3 large snags per acre when only an average of 2.02 large snags per acre exist in dry forests Forest-wide. ECF No. 34 at 6. Plaintiffs' inappropriately focus exclusively on one set of static numbers. Their characterization of the snag density is misleading and they fundamentally mischaracterize the FEIS.

As explained in Defendant's opening brief, the Forest Service used methodology consistent with the best available science to determine the historical snag density distribution across the Forest by forest type. ECF No. 34 at 9; *see also* AR 25317-349; AR 29269; AR 29270-272. That Forest-wide analysis showed that there are currently an overabundance of acres in dry forests with high densities of large snags (>4 snags/acre) and a deficit of acres with low densities of large snags (1-4 snags/acre) as compared to historical conditions. AR 29269-270 (Figure 3-9). Thus, to move the Forest toward its historical conditions—which should provide

habitat for primary cavity excavators, AR 29273—the Project FEIS ensures that if harvest of large snags in dry forests is to occur, it will not reduce the snag density below 3 large snags per acre. AR 29269; AR 29273. In other words, where there is an overabundance of snags per acre of dry forest, the Project will "retain" a minimum of 3 large snags per acre. AR 29269. Nothing in the FEIS says that the South George Project will create more large snags than currently exist Forest-wide to ensure that dry forests contain 3 large snags per acre. And nowhere in the record does the Forest Service state that 3 large snags per acre are required in dry forests Forest-wide to maintain primary cavity excavator viability.

This comparative approach of historical and existing snag density distribution is consistent with the management direction in the Umatilla Forest Plan, as amended by the Revised Continuation of Interim Management Direction Establishing Riparian, Ecosystem and Wildlife Standards for Timber Sales ("Eastside Screens"), that provides that the Forest Service "will maintain snags . . . at 100% potential population levels of primary cavity excavators" by using "the best available science on species requirements." AR 9543. The Eastside Screens's chosen means to maintain viability is to ensure retention of sufficient structural elements necessary for species survival. This is what the South George Project does by moving the Forest toward its historical snag density distribution. In addition to the analysis of snag density distribution, the Forest Service used other methodologies and design features recommended by the best available science to ensure sufficient snag habitat into the future, including:

- Using methodologies recommended by Rose, *et al*. (2010) to consider fall rate of snags, the rate at which green trees would reach certain diameters and function as replacement snags, and implementation of

monitoring of snags and live tree habitats.  *See* AR 14629 (Rose, *et al.*); AR 29123-124 (FEIS – Project Design Features and Management Requirements);

- Leaving overly dense stands in fully stocked condition after treatment that will provide a source of future snags.  AR 29273;

- Retaining "all functioning snag habitat (broken tops, signs of excavation, etc.) . . . wherever possible."  AR 29269;

- Leaving most large trees (>21 inches diameter at breast height ("dbh")) as part of the replacement tree stock for future snag recruitment. AR 29269; AR 29273;

- Requiring at least 16 leave trees per acre following treatment to provide a source for future snags.  AR 29273;

- Leaving of small diameter snags (10 to 19 inches dbh) that are also used by primary cavity excavators.  AR 29273;

- Prohibiting the piling of slash against snags to reduce snag loss during prescribed burning.  AR 29122.

All of the management requirements and project design features listed above function to maintain the density and distribution of existing snags and provide a source of snags in the future to return the Project Area to conditions more in line with the historical range of variability.  In this case, the Forest Service assessed the viability of primary cavity excavators by evaluating the impact to those habitat components in the Project Area and comparing those impacts to the availability of habitat Forest-wide.

Based upon the application of these requirements and the best science available, the Forest Service calculated that the "project would affect less than 1

1    percent (.006) of the forested land on the Umatilla National Forest.  AR 29274.  The

2    Forest Service then concluded "[t]he amount of effect from this project is too small

3    to cause changes in cavity excavator populations.  AR 29274.  The mere fact that

4    the South George Project may impact some primary cavity excavator habitat does

5    not mean that it has violated any Plan-based viability requirement.  *See Castaneda*,

6    574 F.3d at 663 ("A habitat disturbance does not necessarily mean that a species'

7    viability will be threatened."); *McNair*, 537 F.3d at 997 ("That a proposed project

8    involves some disturbance to the forest does not prohibit the Forest Service from

9    assuming that maintaining a sufficient amount of suitable habitat will maintain

10   species' viability.").  Therefore, the Project is consistent with the Forest Plan and

11   continued viability of primary cavity excavators is expected on the Umatilla

12   National Forest.  *Id*.

13          Here, the Forest Service has conducted a thorough analysis that supports its

14   conclusion that the South George Project will ensure primary cavity excavators

15   populations.  The deferential standard of review of agency actions "is narrow," and

16   the reviewing court is not to "substitute [its] judgment for that of the agency."

17   *Earth Island Inst.*, 697 F.3d at 1013 (citing *McNair*, 537 F.3d at 987).  Plaintiffs

18   have failed to meet their burden of showing that the Forest Service acted in a

19   manner that was "arbitrary, capricious, an abuse of discretion, or otherwise not in

20   accordance with law."  *Forest Guardians v. U.S. Forest Serv.*, 495 F.3d 1162, 1168

21   (10th Cir. 2007) (citing 5 U.S.C. § 706(2)(A)).   The Court should deny Plaintiffs'

22   motion for summary judgment on this issue.  Summary judgment in favor of

23   Defendant is warranted.

24

25

1

3.  Even if the Forest Plan Contains a Project Level Viability
    Requirement, the Forest Service Has Satisfied It.

2

3      To the extent that the Forest Plan does impose any project level duties with

4  respect to primary cavity excavators, either through the incorporation of the 1982

5  viability requirements or otherwise, the Forest Service has complied with such

6  duties.  As noted above, the Eastside Screens's chosen means to maintain primary

7  cavity excavator populations is to ensure retention of sufficient structural elements

8  necessary for species survival.  The Project FEIS documents compliance with the

9  Eastside Screens's management direction with the use of best available science to

10  determine optimal snag density distribution throughout the South George Project

11  Area by forest type.  AR 9486; AR 9543; *see also*, AR 29245; AR 29451-453;

12  AR 29663-664; AR 29670-671; AR 29942.

13      Plaintiffs make the same argument with respect to the Project Area—that the

14  Forest Service cannot provide 3 large snags per acre in the Project Area when only

15  1.1 snags per acre exist—as they do the Forest as a whole.  ECF No. 34 at 4.  Again,

16  Plaintiffs misunderstand the 3 snag per acre number.  Similar to the Forest-wide

17  analysis, the Forest Service compared the historical and existing snag density

18  distribution in dry forests in the Project Area.  AR 29273-274.  And similarly, the

19  Forest Service found an overabundance of acres with too many large snags

20  (>4 snags per acre), and a deficit of acres with lower large snag density (1-4 snags

21  per acre).  AR 29269; AR 29270.  In order to move the Project Area toward

22  historical conditions and provide the structural features that will maintain primary

23  excavator populations, the Forest Service determined that, where snags will be

24  harvested, it should retain at least 3 large snags per acre.  AR 29269; AR 29273.

25

Indeed, the use of best available science to determine the optimal snag density distribution by forest type, and the other design features incorporated in the South George Project (outlined above) ensure that the Project Area will provide the structural features necessary to maintain primary excavator populations not only immediately post-Project implementation, but in the future. Plaintiffs have failed to demonstrate how the Project violates NFMA. Summary judgment should be entered in favor of Defendant.

B. <u>The Forest Service Complied With NFMA By Following the Appropriate Standards When It Authorized Fire and Fuels Management Treatments in Riparian Habitat Conservation Areas</u>.

As explained in Defendant's opening brief, the South George Project is consistent with PACFISH because the treatments that the Project authorizes meet one of PACFISH's standards, FM-1, which allows fire and fuels management treatments in Riparian Habitat Conservation Areas so long as certain objectives are met. ECF No. 31 at 15-22. Plaintiffs do not argue that the treatments fail to meet the requirements of the FM-1 standard. Rather, Plaintiffs respond that the Forest Service's reliance on the FM-1 standard is *post hoc* rationalization and unsupported by the record, and continue to insist that the Forest Service was actually trying to inappropriately apply timber management standard, TM-1, to authorize such treatments. As demonstrated below, Plaintiffs' contention is unsubstantiated, the actions comply with PACFISH, and Defendant is thus entitled to summary judgment on this claim.

1          1.    The Administrative Record Demonstrates That the Forest
2                Service Relied on the FM-1 Standard to Authorize Fire and Fuel
3                Treatments in Riparian Habitat Conservation Areas.

4          The administrative record shows that the Forest Service articulated the

5   justification for authorizing fire and fuels management treatments in Riparian

6   Habitat Conservation Areas at the time it made its decision.  Although the FEIS may

7   not specifically reference the FM-1 standard by name, it unequivocally defines the

8   treatments as fire and fuels management treatments, and the environmental analysis

9   discusses the impacts in terms of the standard's specific requirements.  The

10  application of the FM-1 standard to authorize these treatments is not *post-hoc*

11  rationalization and should be upheld.  *See Public Citizen v. Nuclear Regulatory*

12  *Comm'n*, 573 F.3d 916, 923 (9th Cir. 2009) (upholding agency's decision "of less

13  than ideal clarity if the agency's path may reasonably be discerned").

14         First, the Project FEIS unmistakably identifies the treatments in Riparian

15  Habitat Conservation Areas and discusses their purpose to be fire and fuels

16  management treatments rather than timber management or other activities.  For

17  example, the FEIS describes the treatments under the proposed action as "Riparian

18  Habitat Conservation Area (RHCA) Fuels Treatment," and lists the treatments in a

19  section separate from "Timber Harvest."  AR 29090-91.  Indeed, all throughout the

20  FEIS, it describes the treatments within the Riparian Habitat Conservation Areas as

21  fire and fuels management treatments rather than timber management activities.  *See*

22  AR 29096 (describing decisions to be made and "commercial timber harvest, fuels

23  treatments (landscape prescribed fire, non-commercial thinning, and non-

24  commercial mechanical treatment of approximately 25 acres in [Riparian Habitat

25  Conservation Areas]) . . ."); AR 29116 (describing "[Riparian Habitat Conservation

Area] Fuels Treatments" under description of proposed action; AR 29117 (listing "[Riparian Habitat Conservation Area] non-commercial mechanical fuel treatments" as a separate item under summary of proposed activities); AR 29118 (describing Riparian Habitat Conservation Area activities "to reduce probability of crown fire initiation"); AR 29169 (discussing purpose of "[Riparian Habitat Conservation Area] Fuels Treatment" as "reduc[ing] probability of crown fire initiation" and "disrupt[ing] crown continuity"); AR 26196 (discussing the impacts of the "fuels treatment"); AR 29186 (applying separate fish habitat restoration criteria to the Riparian Habitat Conservation Area treatments from the rest of the project); AR 29238 (discussing purpose of Riparian Habitat Conservation Area fuels treatments). Thus, there is no doubt that the Forest Service considered the activities occurring in the Riparian Habitat Conservation Areas as fire and fuels treatments, and distinct from commercial timber harvest activities.

In addition, the FEIS and other project documents specifically reference PACFISH's fire and fuels management standards and the environmental analysis analyzes the treatments impacts in terms of the requirements imposed in the FM-1 standard. For example, the FM-1 standard was specifically referenced in the fish biologist's document to the interdisciplinary team members, AR 21546, demonstrating that the FM-1 standard was considered early in the NEPA process. In its discussion of the Project design features and management requirements, the FEIS discloses that "PACFISH standards and guidelines related to timber harvest, roads, and <u>fire</u>, apply to this project and are incorporated by reference into this document." AR 29188 (emphasis added); *see also* AR 29458 (same). And the FEIS discusses the impacts of the Riparian Habitat Conservation Area fire and fuels treatments to water quality in terms of the FM-1 standard's language that fuel

treatments must be designed "so as to not prevent attainment of Riparian Management Objectives."  *Compare* AR 29169 ("This fuels treatment would not be expected to <u>prevent attainment</u> or retard recovery of the water temperature Riparian Management Objective (RMO).") (emphasis added) *with* AR 9144 (FM-1 standard providing that fuel treatments must be designed "so as not to <u>prevent attainment</u> of Riparian Management Objectives.") (emphasis added).  The record demonstrates that reliance on the FM-1 standard to authorize fire and fuel treatments in the Riparian Habitat Conservation Areas is not *post hoc* rationalization.

Despite Defendant's demonstration that the TM-1 standard does not apply to the Riparian Habitat Conservation Area fire and fuels management treatments in this Project, Plaintiffs continue insist that the Forest Service relied on this standard to authorize the treatments, and did so improperly.  ECF No. 34 at 11-12.  Plaintiffs argue that a reference to timber management standard, TM-1, in the FEIS demonstrates that the Forest Service relied on that standard to authorize timber harvest in the Riparian Habitat Conservation Areas, rather than FM-1.  ECF No. 34 at 8.  Plaintiffs misunderstand the analysis in the FEIS.  The FEIS discussed the TM-1 standard in the context of its consistency review with the Eastside Screens.  *See* AR 29448.   The Eastside Screens's standard and guideline for timber management activities in riparian areas directs that "timber sales will not be planned or located" in such areas.  AR 29447.  Referencing the TM-1 standard, the FEIS discloses that the PACFISH standards for timber management in riparian areas apply in lieu of the Eastside Screens's riparian standard.  AR 29447-448.  However, in discussing the timber management treatments proposed by the Project, the consistency review finds that "[n]one of the silvicultural proposed actions . . . will occur in any of the riparian habitat conservations areas established by PACFISH."

AR 29448.  This is further evidence that the Forest Service did not rely on the TM-1 standard to authorize the treatments in Riparian Habitat Conservation Areas.

As demonstrated above, the Forest Service relied on the FM-1 standard to authorize RHCA fire and fuels treatments and articulated the basis for its decision in the FEIS.[2]  It was not *post hoc* rationalization.  The Forest Service appropriately applied the FM-1 standard consistent with the requirements in PACFISH, and thus complied with NFMA.  Because the Forest Service's decision complies with PACFISH and NFMA, no Forest Plan amendment is needed.  *See* ECF No. 34 at 12.  The Court should deny Plaintiffs' motion for summary judgment and find in favor of Defendant.

C.    The Forest Service Took a Hard Look at Impacts to Potential Wilderness Areas, and Thus Complied With NEPA.

Consistent with its obligations under NEPA, the Forest Service took a hard look at the application of a 300-foot roadside buffer when analyzing the South George Project Area for potential wilderness areas.  Plaintiffs argue that it was arbitrary and capricious to apply a standard 300-foot roadside buffer to exclude evidence of past harvest activities to areas that contain little or no trees.  ECF No. 34 at 13-14.  In doing so, Plaintiffs argue that the Forest Service "disregarded [a] unique aspect of the [ ] Forest; namely, its steppe-shrublands."  *Id.* at 13.

_____

[2] Misreading Defendant's brief, Plaintiffs state that Defendant wrongly concludes that "the agency's rationale for the proposed harvest irrelevant [sic]."  ECF No. 34 at 9 (citing ECF No. 31 at 19 n.12).  Defendant's brief says no such thing, but states that the Forest Service does not need to articulate how the Project meets a standard that is not applicable to the proposed action.

In identifying areas that might qualify for potential wilderness, the Forest Service did not ignore areas that lacked trees in applying a 300-foot roadside buffer. The Forest Service applied the roadside buffer to exclude areas inconsistent with potential wilderness because they contained evidence of past harvest or road maintenance activities that resulted in recognizable stumps, skid trails, and uneven canopy closure.  AR 29499.  The Forest Service also recognized that "stumps are not present along every mile of forest road."  AR 29499; *see also* AR 2949 (recognizing that evidence of past harvest "occur to varying degrees adjacent to forest roads").

The Forest Service also considered the Inventory Criteria in Forest Service Handbook 1909.12 (71.1) and the Boundary Adjustment Guidelines in FSH 1909.12 (72.5).  AR 29327; AR 29496-521 (Appendix H); AR 29522-532 (Appendix I); AR 29599-624.  Those Boundary Adjustment Guidelines explicitly direct the Forest Service, when adjusting boundaries for potential wilderness areas, to

> use semi-permanent human-made features that are locatable on the map and on the ground.  Roads, trails, dams, powerlines and pipelines, and bridges may be used.  In addition, lines may be drawn parallel and set back a given distance from any of these features with well-defined starting and ending points.

FSH 1909.12(72.5); *see also id.* ("Establish boundaries that are easy to define and locate on the ground and that can be managed.")  The Forest Service did exactly as the Forest Service Handbook directed:  in its professional judgment, it drew a "uniform, measurable" boundary parallel to and set back a given distance from existing roads to facilitate easy identification of potential wilderness areas. AR 29499.   Additionally, the Forest Service specifically addressed this issue in its response to comments on the draft EIS.  AR 29599-624.  The Forest Service's

experts are entitled to deference in applying criteria used to identify potential wilderness areas, and the Court should defer to the Forest Service's technical expertise. *Marsh v. Or. Natural Resources Council*, 490 U.S. 360, 377 (1989); *see also Kritchbaum v. U.S. Forest Serv.,* 973 F.Supp. 585, 591-92 (W.D. Va. 1997), *aff'd* 139 F.3d 890 (4th Cir. 1998) (table) (Forest Service entitled to rely on its own data and method of determining old growth . . . the court must defer to the Forest Service's scientific methodology); *Utah Envtl. Cong. v. Bosworth*, 285 F.Supp.2d 1257, 1265 (D. Utah 2003), *rev'd on other grounds* (choice of scientific methodology is within agency's discretion).

Plaintiffs argue that the Forest Service could have easily identified where steppe-shrublands occur alongside roads and could have then excluded application of the roadside buffer to those areas. ECF No. 34 at 15-16. However, whether the Forest Service could easily identify these treeless areas is not the issue. As stated above, the Forest Service recognized that such treeless areas existed along the roadside but determined to apply a standard roadside buffer despite these areas in order to create manageable boundaries. The Forest Service's approach makes sense, particularly if one looks at a map of past harvest activity in the South George Project Area. Contrary to Plaintiffs' claim that there are "large swaths of steppe-shrublands" alongside the Forest roads, ECF No. 34 at 16, the map shows that there is a patchwork of harvested and non-harvested areas along these roads. *See* AR 29512. The harvested areas displayed on Map H-2A, AR 29512, do not include areas where felling and clearing of trees for road maintenance purposes occurred, or where harvest of trees for firewood, which is permitted within 300 feet of open forest roads, occurred. AR 29499. Those areas also were excluded from potential wilderness areas because such activities also create visible stumps in the road

corridor.  *Id.*  Review of the map alone demonstrates that it would have been difficult for the Forest Service to manage a boundary that weaved back and forth from a 300-foot roadside buffer to a boundary that ran right up to the road where treeless areas occur.

Finally, to the extent that Plaintiffs' allege that such treeless areas were not considered at all in identifying potential wilderness areas and the Project's impacts to such areas, they are wrong.  In Appendix I of the South George FEIS, the Forest Service extensively documented the analysis of the undeveloped land mapped by Oregon Wild during the comment period on the draft EIS.[3]  AR 29522-532.  Oregon Wild's map did not deduct acreage adjacent to roads.  AR 29525; *see also* AR 26528 (map).  Thus, the Forest Service did consider potential wilderness areas without application of the roadside buffer, and found that the area still did not qualify as a potential wilderness area.  AR 25746-748; AR 26364-366; AR 29499; AR 29518; AR 29526.

Plaintiffs have not demonstrated that the Forest Service failed to take a hard look at steppe-shrublands when the Forest Service applied a standard roadside buffer when inventorying areas for potential wilderness.  Plaintiffs' claim must fail and judgment entered in favor of Defendant.

---

[3] Oregon Wild's area overlaps with the largest undeveloped area, Polygon 1, that was mapped by the Forest Service.  *Compare* AR 29529 (Map I-OW-2) *with* AR 29517 (Map H-5); AR 29518 (Map H-5A).

D. <u>Summary Judgment in Favor of the Forest Service is Warranted On All Remaining Claims.</u>

Neither Plaintiffs' opening brief nor its response to Defendant's cross-motion for summary judgment address the viability determination for pine marten, pileated woodpecker, or northern three-toes woodpecker. *See*, ECF No. 1 at 10 (Compl., ¶ 35). Plaintiffs have also failed to address issues related to alleged violations of PACFISH through grazing and recreation. *Id*. at 12-13 (Compl., ¶¶ 44-46).

Defendant has shown that those issues are inadequately pleaded in the Complaint and thus do not state viable claims. ECF No. 31 at 25-26; *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). In addition, those issues are deemed abandoned as Plaintiffs did not raise them in their summary judgment motion. *Grenier v. Cyanamid Plastics, Inc*., 70 F.3d 667, 678 (1st Cir. 1995); *Head Start Family Educ. Program, Inc. v. Coop. Educ. Serv. Agency 11*, 46 F.3d 629, 635 (7th Cir. 1995); *Steeves v. City of Rockland*, 600 F. Supp. 2d 143, 173 n. 117 (D. Me. 2009) (citing *Grenier*, 70 F.3d at 678). Lastly, Plaintiffs failed to address those same issues when raised by Defendant in its cross-motion for summary judgment. If a party fails to properly respond to issues raised by the moving party on summary judgment, summary judgment for the moving party is appropriate. *Shakur v. Schriro*, 514 F.3d 878, 892 (9th Cir. 2008) (We have previously held that a plaintiff has abandoned claims by not raising them in opposition to the defendant's motion for summary judgment); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Those issues are unopposed, requiring the Court to grant summary judgment to the Forest Service on those remaining issues.

# III.    CONCLUSION

Plaintiffs' NFMA claims are largely based on a misunderstanding of the Project.   By using the best available science to determine the optimal habitat features for primary cavity excavators both Forest-wide and in the South George Project Area, the Forest Service met the requirements to provide for 100 percent potential population.   In addition, the Forest Service disclosed and appropriately applied PACFISH's fire and fuels management standard, FM-1, to treatments located in Riparian Habitat Conservation Areas.  The Forest Service thus complied with NFMA.  The Forest Service also complied with its obligations under NEPA to take a hard look at its procedures for inventorying the South George Project Area for potential wilderness areas.  For the foregoing reasons, the Court should deny Plaintiffs' motion for summary judgment and grant Defendant's motion for summary judgment, and dismiss the case in its entirety.

Dated this 13th day of September 2013.

ROBERT G. DREHER
Assistant Attorney General
Environment & Natural Resources Division
JULIA S. THROWER


s/Julia S. Thrower
Attorney
Attorney for United States Forest Service




MICHAEL C. ORMSBY
United States Attorney


s/Rudy J. Verschoor
RUDY J. VERSCHOOR
Assistant United States Attorney
Attorney for United States Forest Service

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 13, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| Rick Eichstaedt: | ricke@cforjustice.org |
| Sean T. Malone: | seanmalone8@hotmail.com |
| Edward Joseph Bruya: | ebruya@kkbowman.com |
| Scott W. Horngren: | shorngren@amforest.org |
| Rudy J. Verschoor: | USAWAE.RverschoorECF@usdoj.gov |

s/Julia S. Thrower
Attorney
Attorney for United States Forest Service