UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

THE LANDS COUNCIL, HELLS CANYON
PRESERVATION COUNCIL, and LEAGUE
OF WILDERNESS DEFENDERS -- BLUE
MOUNTAINS BIODIVERSITY PROJECT,

      Plaintiffs,

      v.

UNITED STATES FOREST SERVICE,

      Defendant,

and

ASOTIN COUNTY, a political
subdivision of the State of
Washington, and AMERICAN FOREST
RESOURCE COUNCIL,

      Defendants/Intervenors

CV-12-619-FVS-1

**ORDER DENYING THE
PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT AND
GRANTING THE DEFENDANTS'
MOTIONS FOR SUMMARY
JUDGMENT**

    **THIS MATTER** came before the Court on December 18, 2013, based upon the parties' cross motions for summary judgment.  Sean T. Malone argued for the plaintiffs.  Julia S. Thrower argued for the United States Forest Service.  Scott W. Horngren argued for Asotin County and the American Forest Resource Council.  For the reasons set forth below, the plaintiffs' motion is denied and the defendants' respective motions are granted.

    **BACKGROUND**

    The Blue Mountains are located in the northeast corner of the

Order - 1

State of Oregon and, to some extent, in the southeast corner of the State of Washington.  The climate in the Blue Mountains is demanding. In order to survive, vegetation must be able to withstand hot, dry summers.  One of the vegetation groups that exists within the Blue Mountains is the dry upland forest.  At one time, the dry upland forest was dominated by large, old ponderosa pine trees.

Ponderosa pine trees were important in life and in death.  After dying, some of them remained standing.  A "standing dead tree" is a "snag."  (Glossary to Final Environmental Impact Statement at 18 (AR-29364).)  A large snag is one whose diameter at breast height ("DBH") is 20 inches or more.  Large snags provide habitat for a number of species of birds.  Some of the species -- woodpeckers, for example -- are grouped together under the heading "primary cavity excavators." As the name suggests, "[p]rimary cavity excavators create holes for nesting or roosting in live, dead or decaying trees."  (Final Environmental Impact Statement at 3-121 (AR-29268).)

Large, old ponderosa pine trees no longer dominate the dry upland forests.  Their decline has been dramatic.  Some of the decline is attributable to logging; some of it is attributable to fire suppression.  In any event, conditions within the dry upland forest have changed.  The changes have been detrimental to those species of birds that depended upon the conditions that once existed.

A significant part of the Blue Mountains is located within the Umatilla National Forest.  The Umatilla National Forest is divided into ranger districts.  One of them is the Pomeroy Ranger District. Within the Pomeroy Ranger District, there is a 21,000-acre area that

the United States Forest Service refers to as "the South George project planning area."  Most of the planning area is situated within Asotin County, Washington.

Forests within the South George project planning area are declining in health.  They have become susceptible to insects, disease, and fire.  Forest fires are a sensitive subject in Asotin County.  In 2005 and 2006, major fires occurred on land that is located just to the west of Asotin County.  The fires were a painful reminder of the devastation that such phenomena cause.  (Declaration of Brian Shinn (ECF No. 12) at 2.)

After studying the South George planning area, the Forest Service published a Draft Environmental Impact Statement for a proposed "South George Vegetation and Fuels Management Project."  The Forest Service received comments from federal and state agencies, environmental organizations, members of the timber industry, and concerned citizens. During July of 2012, the Forest Service published a Final Environmental Impact Statement ("FEIS"), which analyzed a number of potential courses of action.  On July 17, 2012, the Forest Service issued the "Record of Decision for the South George Vegetation and Fuels Management Project."  Stated very broadly, the purpose of the Project is to use environmentally responsible silvicultural techniques in order to restore forests within the Project area to their historical range of variability.

The term "silviculture" is defined as "[t]he practice of manipulating the establishment, composition, structure, growth, and rate of succession of forests to accomplish specific objectives."

(Glossary at 17 (AR-29363).)  Here, the Forest Service has decided to (1) harvest timber on approximately 3,900 acres of land, (2) remove trees that are likely to fall on roads, (3) burn approximately 3,000 acres of land, and (4) thin approximately 25 acres of forest that is located within a Riparian Habitat Conservation Area.  The purpose of those actions is to begin the process of restoring the forests in question to their historical range of variability ("HRV").  (*See, e.g.*, FEIS at S-3, (AR-29060)).  In the Final Environmental Impact Statement, the term HRV "refers to the range of conditions and processes that are likely to have occurred prior to settlement of the project area by people of European descent (approximately the mid 1800s), which would have varied within certain limits over time." (Glossary at 11 (AR-29357).)

As noted above, one of the areas that will be affected by the Project lies within a Riparian Habitat Conservation Area.  The definition of a "riparian area" is fairly concrete.  A riparian area is simply "an area along a watercourse."  *Id.* at 16 (AR-29362).)  The definition of a Riparian Habitat Conservation Area ("RHCA") is fairly abstract.  For purposes of the Final Environmental Impact Statement, a RHCA includes "[p]ortions of watershed where riparian-dependent resources receive emphasis, and management activities are subject to specific standards and guidelines."  *Id.*

On December 10, 2012, three environmental organizations filed an action seeking to enjoin the Project.  One of them is The Lands Council.  A second is the Hells Canyon Preservation Council.  A third is the League of Wilderness Defenders -- Blue Mountains Biodiversity

Order - 4

Project.  They allege the Forest Service's decision to proceed with the Project violates both the National Forest Management Act, 16 U.S.C. §§ 1600-1687, and the National Environmental Policy Act, 42 U.S.C. §§ 4321-4370.  As the plaintiffs acknowledge, neither the National Forest Management Act nor the National Environmental Policy Act provides a private cause of action.  *See, e.g., Earth Island Institute v. United States Forest Service*, 697 F.3d 1010, 1013 (9th Cir.2012).  Nevertheless, the plaintiffs may obtain judicial review of an agency decision under the Administrative Procedure Act, 5 U.S.C. § 551-706.  This Court has jurisdiction over the subject matter of the action pursuant to 28 U.S.C. § 1331.

On April 25, 2013, both Asotin County and the American Forest Resource Council received permission to intervene as defendants.  As explained above, the proposed Project will take place on land that is located in Asotin County.  The county commissioners argue that the proposed Project is necessary to prevent forest fires and that it will provide jobs for a sparsely populated county whose residents desperately need work.  The American Forest Resource Council ("AFRC") is an organization that represents wood products companies throughout the western United States.  Several companies that belong to the AFRC purchase timber.  If the proposed Project is enjoined, says the AFRC, its member companies will lose an important source of timber.

The parties have filed cross motions for summary judgment.  The Rule 56 standard is well established.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

Order - 5

of law."  Fed.R.Civ.P. 56(a).  The moving parties agree about one thing:  There is no genuine issue of material fact.

**STANDARD OF REVIEW**

The Court must set aside the Forest Service's decision to proceed with the South George Vegetation and Fuels Management Project if the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2)(A).  However, review under the arbitrary and capricious standard is narrow. *Earth Island Institute*, 697 F.3d at 1014 (internal punctuation and citation omitted).  The Ninth Circuit has explained:

> "An agency action is arbitrary and capricious if the agency
> . . . relied on factors which Congress has not intended it
> to consider, entirely failed to consider an important aspect
> of the problem, offered an explanation for its decision that
> runs counter to the evidence before the agency, or is so
> implausible that it could not be ascribed to a difference in
> view or the product of agency expertise."

*See, e.g., Confederated Tribes of the Umatilla Indian Reservation v. BPA*, 342 F.3d 924, 928 (9th Cir.2003) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (hereinafter "*Confederated Tribes*").

**INTRODUCTION TO THE PLAINTIFFS' ALLEGATIONS**

A. National Forest Management Act

The National Forest Management Act "provides both procedural and substantive requirements.  Procedurally, it requires the Forest Service to develop and maintain forest resource management plans." *Ecology Center v. Castaneda*, 574 F.3d 652, 656 (9th Cir.2009) (citation omitted).  A forest plan "is a broad, long-term planning

Order - 6

document for an administrative unit of the National Forest System.  A
forest plan establishes goals and objectives for management of forest
resources."  *Earth Island Institute*, 697 F.3d at 1014 (citing 16
U.S.C. § 1604(g)(1)-(3)).  In this case, the relevant forest plan is
the Umatilla National Forest Land and Resources Management Plan.
Hereinafter, it will be referred to as either "the Umatilla National
Forest Plan" or, simply, "the Plan."

The Forest Service adopted the Plan in 1990.  (Umatilla National
Forest Plan at __ (AR-5051).)  A forest plan can be, and frequently
is, amended by the Forest Service.  The Umatilla National Forest Plan
is no exception.  It was amended twice during 1995.

The first of the two 1995 amendments was Forest Plan Amendment
#10.  (FEIS at 1-10, 1-11 (AR-29092, AR-29093).)  It has a daunting
title:  "Decision Notice/Decision Record, Finding of No Significant
Impact, Environmental Assessment, for the Interim Strategies for
Managing Anadromous Fish-producing Watersheds in Eastern Oregon and
Washington, Idaho, and Portions of California."  (AR-9001.)  The
parties rarely use the formal title of Amendment #10.  Instead, they
typically refer to it as "PACFISH."  (FEIS at 1-10, 1-11 (AR-29092,
AR-29093).)  This order generally follows the parties' practice.
Hereafter, Amendment #10 will sometimes be referred to as the "Interim
Strategies for Managing Anadromous Fish-producing Watersheds," and
sometimes it will be referred to as "PACFISH."  As will be explained
in greater detail below, PACFISH provides "protection for fish
habitat, particularly regarding activities within riparian areas."
(*Id.* at 1-11 (AR-29093).)

Order - 7

The other amendment that occurred in 1995 is Amendment #11.  It's title is equally daunting:  "Decision Notice for the Revised Continuation of Interim Management Direction Establishing Riparian, Ecosystem and Wildlife Standards for Timber Sales."  (AR-9486.)  Once again, the parties rarely use the formal title of Amendment #11.  Instead, they typically refer to it as the "Eastside Screens."  (FEIS at 1-11 (AR-29093).)  The Eastside Screens impose limits upon timber sales in the Umatilla National Forest.

The Forest Service is satisfied the South George Vegetation and Fuels Management Project is consistent with the Umatilla National Forest Plan.  The plaintiffs disagree.  They claim the Project is inconsistent with the Plan in two material respects.  To begin with, they allege the Forest Service has failed to demonstrate the Project preserves enough snag habitat in dry upland forest in order to ensure the viability of primary cavity excavators.  In addition, the plaintiffs allege the Forest Service has failed to demonstrate it is appropriate to remove trees from land that is located within a Riparian Habitat Conservation Area.

*1. Snag Habitat*

The Final Environmental Impact Statement includes an analysis of snag habitat.  Snag habitat varies among vegetation groups.  On average, there are more large snags per acre is moist upland forest (mixed conifer trees) than in dry upland forest (ponderosa pine trees).  The Project area is no exception.  On average, there are 3 large snags per acre in moist upland forest and 1.1 large snags per acre in dry upland forest.  (FEIS at 3-122, Table 3-69 (AR-29269)).

The plaintiffs are concerned about the lack of large snag habitat in dry upland forest.  There are approximately 2,950 acres of dry upland forest in the Project area.  Of those acres, 926 will be logged.  (Logging will also take place in moist upland forest.)  The Forest Service intends to retain three large snags per acre in those parts of the dry upland forest that are to be logged.  (FEIS at 3-122 (AR-29269)).

The plaintiffs question whether three large snags per acre is adequate to maintain the viability of primary cavity excavators in the Project area.  Even if it is, the plaintiffs submit the Forest Services faces a problem.  On average, there are only 1.1 large snags per acre in dry upland forest in the Project area.  That being the case, say the plaintiffs, the Forest Service cannot accomplish its objective of retaining three large snags per acre.  In the plaintiffs' opinion, this means there will not be enough large snag habitat to maintain the population of primary cavity excavators in dry upland forest.

*2. Tree Removal in Riparian Habitat Conservation Area*

George Creek flows through the Project area.  An unnamed stream flows into George Creek.  The Forest Service has decided to remove some trees from 25 acres of forest that lie along the unnamed tributary.  The purpose of the tree removal is to reduce the risk of forest fire.  The plaintiffs object to the tree removal.  The 25 acres in question are located in a Riparian Habitat Conservation Area ("RHCA").  Removal of trees within a RHCA is governed by PACFISH.  As will be recalled, the term "PACFISH" refers to one of the 1995

Order - 9

amendments to the Umatilla National Forest Plan.  ("Interim Strategies for Managing Anadromous Fish-producing Watersheds," Appendix C, (AR-9001).)  PACFISH establishes "Standards and Guidelines" for "Timber Management" in a RHCA.  (*Id.* at C-910 (AR-9139).)  The plaintiffs argue the proposed tree removal does not satisfy the relevant requirements.

<u>B. National Environmental Policy Act</u>

The Forest Service had a duty, under the National Environmental Policy Act, to take a "hard look" at the environmental consequences of the South George Vegetation and Fuels Management Project.  *See Native Ecosystems Council v. United States Forest Service*, 428 F.3d 1233, 1240 (9th Cir.2005).  Among other things, the Forest Service completed an inventory of potential wilderness areas that exist within the Project area.  As part of the process, the Forest Service had to identify the boundaries for potential wilderness areas.  In order to make the identification of wilderness boundaries easier, the Forest Service decided to exclude from potential wilderness areas all land that is located within 300 feet of a road.  The plaintiffs argue that, by imposing a 300-foot buffer along roads, the Forest Service arbitrarily excluded land from potential wilderness areas that is suitable for inclusion in them.

**1982 RULE**

One of the principal issues in this case is whether the South George Vegetation and Fuels Management Project is consistent with the Umatilla National Forest Plan.  The plaintiffs say "No."  The Forest Service and the defendant intervenors say "Yes."  Why have they

Order - 10

reached different conclusions?  In part, it is because they disagree with respect to what the Plan requires of the Forest Service.

The plaintiffs submit the Plan incorporates a set of regulations that have come to be known as "the 1982 rule."  The Ninth Circuit summarized the 1982 rule in *Earth Island Institute v. United States Forest Service*:

> Under NFMA, the Secretary [of Agriculture] was required to
> promulgate regulations that set out guidelines and standards
> to "provide for diversity of plant and animal communities
> based on the suitability and capability of the specific land
> area . . . ."  16 U.S.C. § 1604(g)(3)(B).  Accordingly, in
> 1982 the Forest Service issued planning regulations (known
> as the 1982 rule) to implement NFMA's viability
> requirements.  The 1982 rule "require[d] the Forest Service
> to identify and monitor management indicator species ('MIS')
> and direct[ed] that 'fish and wildlife habitat shall be
> managed to maintain viable populations of existing native
> and desired non-native vertebrate species.'"  [*Ecology
> Center v. Castaneda*, 574 F.3d 652, 657 (9th Cir.2009)]
> (quoting 47 Fed. Reg. 43,048 (Sept. 30, 1982)); ***see also* 36
> C.F.R. § 219.19 (1982).**

*Earth Island Institute*, 697 F.3d at 1013-14 (emphasis added).[1]  Does the 1982 rule apply in this case?  The answer to that question depends upon whether the requirements of the 1982 rule were incorporated into the Umatilla National Forest Plan.  *See id.*

It is appropriate, then, to turn to the text of the Plan.  It is divided into chapters.  Within Chapter 2, there is a section that is

---

[1]The 1982 Rule was set forth in a prior version of 36 C.F.R. pt. 219.  *See, e.g., Earth Island Institute v. Carlton*, 626 F.3d 462, 476 (9th Cir.2010).

entitled "Wildlife."  Within that section, there is a subsection that
addresses "Indicator Species."  And within that subsection, there is a
citation to § 219.19 (*i.e.*, "the 1982 rule"):

> Seven fish and wildlife indicator species were selected to
> represent animals associated with the major habitat types on
> the Forest.  The habitat requirements of the selected
> indicator species are presumed to represent those of a
> larger group of wildlife species.  Habitat conditions for
> management indicator species, as well as for all other
> wildlife species on the Forest, will be managed to maintain
> viable populations (**36 CFR 219.19**).

(Umatilla National Forest Plan at 2-9 (AR-5078).)  (Emphasis added.)
Not only does the Plan cite 36 C.F.R. § 219.19, say the plaintiffs,
but also there are provisions in Chapter Four of the Plan that
indicate the 1982 rule applies to the South George Vegetation and
Fuels Management Project.

Chapter Four of the Umatilla National Forest Plan is entitled
"Forest Management Direction."  Chapter Four is divided into a number
of sections.  One of the sections in Chapter Four is entitled "Forest-
Wide Standards and Guidelines."  One of the subsections in "Forest-
Wide Standards and Guidelines" addresses "Wildlife Habitat."  And one
of the subsections within "Wildlife Habitat" addresses "Dead and Down
Tree Habitat."  The plaintiffs place great weight upon the first
sentence of paragraph 2, which is located on page 4-57.  It states in
part, "Unless specified in management area direction, as a minimum,
provide the required numbers and sizes of hard snags throughout the
Forest to maintain primary cavity excavators at 40 percent of their
potential population throughout their present range."  (Umatilla

Order - 12

National Forest Plan at 4-57 (AR-5171).)

The preceding quotation is located in a section of Chapter Four that is entitled "Forest-Wide Standards and Guidelines."  The following section in Chapter Four is entitled "Management Areas."  The "Introduction" to that section states in part, "Management Areas provide the multiple-use direction for managing specific areas of land."  (*Id.* at 4-94 (AR-5208).)  Table 4-23 lists 25 Management Areas.  *Id.*  As the plaintiffs point out, the South George Vegetation and Fuels Management Project provides that logging will take place in a number of Management Areas that are listed in Table 4-23.  Affected areas include A6, C1, C3, C3A, C4, and C5.  It is instructive to review the Plan's discussion of Management Area C3, which addresses "Big Game Winter Range."  The Plan provides in part, "Dead and down tree habitat will be managed to provide or maintain 60 percent of the potential population level for all primary cavity excavators as described in Wildlife Habitats in Managed Forests (Thomas and others 1979)."  4-153 (AR-5267).

As explained above, the Umatilla National Forest Plan was amended in 1995.  The defendants concede Amendment # 11 (*i.e.*, the Eastside Screens) "directs the Forest Service to use [the] best available science to maintain snags and green replacement trees greater than 21 inches diameter at breast height ('dbh') at 100 percent potential population levels of primary cavity excavators."  (Memorandum in Response (ECF No. 31) at 9.)  The plaintiffs seize upon the defendants' concession.  The plaintiffs maintain, "[F]or those management areas within [the] South George Project, including A6, C1,

Order - 13

C3, C3A, C4, and C5 . . ., the South George Project must demonstrate that sufficient large snags are provided to maintain viable populations of primary cavity excavators in ponderosa pine habitat." (Combined Response-Reply to Federal Defendants' Combined Motion (ECF No. 34) at 4.)

We see, then, that the plaintiffs are relying upon provisions in both Chapter 2 and Chapter 4 of the Umatilla National Forest Plan.  As they point out, the 1982 rule is cited in Chapter 2.  Moreover, various sections in Chapter 4 emphasize the importance of retaining snag habitat in maintaining populations of primary cavity excavators. The plaintiffs argue that, when read together, the provisions from Chapters 2 and 4 indicate that the Plan incorporates the 1982 rule.

The Forest Service seems to concede the Plan incorporates the 1982 rule at the planning level.  However, the fact a forest plan incorporates the 1982 rule at the planning level does not mean the Forest Service must demonstrate a site-specific project complies with the 1982 rule's viability requirements.  *See Earth Island Institute*, 697 F.3d at 1014 n.1.  In *Earth Island Institute*, for example, the Ninth Circuit ruled a forest plan incorporated certain elements of the 1982 rule, but only at the planning level, not at the project level. *Id.* at 1014.  That is the position of the Forest Service in this case.

The Forest Service also relies upon the text of the 1982 rule. One section provides in pertinent part, "that '[f]ish and wildlife habitat shall be managed to maintain viable populations of existing . . . species in the planning area.'"  *Earth Island Institute*, 697 F.3d at 1015 (quoting 36 C.F.R. § 219.19 (1982)).  It is important to

Order - 14

observe, says the Forest Service, that the 1982 rule does not state that wildlife habitat shall be managed in such a manner so as to maintain viable populations of existing species in the project area. Rather, in those instances in which it has been incorporated into a forest plan, the 1982 rule imposes a viability requirement with respect to "the planning area."  The term "planning area" is defined by a separate section.  The term means "'[t]he area of the National Forest System covered by a regional guide or forest plan.'"  *Utah Environmental Congress v. Bosworth*, 439 F.3d 1184, 1190 (10th Cir.2006) (quoting 36 C.F.R. 219.3).  Thus, according to the Forest Service, the 1982 viability requirement applies to forest-wide plans, not to site-specific projects.

The Forest Service argues its interpretation of the Plan is supported by the Plan's text.  Like the plaintiffs, the Forest Service quotes from the subsection concerning "Dead and Down Tree Habitat." As observed above, paragraph 2 states in part, "Unless specified in management area direction, as a minimum, provide the required numbers and sizes of hard snags **throughout the Forest** to maintain primary cavity excavators at 40 percent of their potential population **throughout their present range**."  The Forest Service places great weight upon the highlighted language in the preceding provision.  One phrase refers to "hard snags throughout the Forest."  Another requires the Forest Service to maintain primary cavity excavators throughout 40 percent of "their present range."  In the opinion of the Forest Service, those phrases indicate the provision applies at the planning level, not the project level.

Having set forth the parties' competing interpretations of the Plan, the Court must determine which of the two is the more persuasive. The plaintiffs' interpretation is supported by the fact the Plan cites 36 C.F.R. § 219.19. Given the citation, it seems reasonable to conclude the drafters of the Plan intended to draw upon the 1982 rule to some extent. But to what extent? The plaintiffs argue the Plan incorporates the 1982 rule at the project level. They cite provisions in Chapters 2 and 4 of the plan. Admittedly, the provisions cited by the plaintiffs contain mandatory language. Does that mean they should be read as binding agency regulations? Not necessarily. "The presence of a few, isolated provision cast in mandatory language does not transform an otherwise suggestive set of guidelines into binding agency regulations." *Castaneda*, 574 F.3d at 660 (internal punctuation and citation omitted). More is required. In order to demonstrate the Plan incorporates the 1982 viability requirements at the project level, the plaintiffs must be able to identify clear language to that effect. *See, e.g., Earth Island Institute*, 697 F.3d at 1014 ("In [*Earth Island Institute v. Carlton*, 626 F.3d 462 (9th Cir.2010)], . . . we determined that a forest plan . . . did not 'clearly' incorporate the [1982] viability requirements, because it did not 'contain[ ] specific provisions regarding wildlife viability.'"). The plaintiffs have not done so. Not one of the passages they cite expressly requires the Forest Service to comply with the 1982 rule at the project level. Indeed, many of the passages seem to contemplate forest-wide polices. At most, the plaintiffs have demonstrated the Plan is ambiguous with respect to whether the 1982

rule is incorporated at the planning level or the project level. Assuming some ambiguity exists, who is best qualified to determine what the plan means?  The Ninth Circuit has answered that question.  A reviewing court should defer to the Forest Service's interpretation of a forest plan unless its interpretation is plainly inconsistent with the plan's terms.  *See Earth Island Institute*, 697 F.3d at 1013 (internal punctuation and citation omitted).  No clear inconsistency exists in this case.  Consequently, the Forest Service's interpretation controls.  The Plan does not incorporate the 1982 rule at the project level.  It follows that the Forest Service is not obligated to demonstrate the Project retains enough large snag habitat in dry upland forest in the project area in order to maintain the viability of primary cavity excavators.  Rather, the Forest Service must demonstrate enough snag habitat exists across the Umatilla National Forest as a whole in order to maintain the viability of primary cavity excavators.

**SNAG HABITAT**

The plaintiffs submit the Project fails to maintain adequate habitat for primary cavity excavators in dry upland forests.  The plaintiffs begin with the text of the Umatilla National Forest Plan. As they read it, the Forest Service must preserve enough habitat to ensure 100 percent population levels of primary cavity excavators. Next, the plaintiffs turn to the Final Environmental Impact Statement. The Forest Service has determined that, on average, it is necessary to retain three large snags per acre in dry upland forest.  However, there are only 1.1 large snags per acre, on average, in the dry

forests that are located within the project area, and there are only 2.02 large snags per acre, on average, in the dry upland forests across the Umatilla National Forest as a whole.  Since there are fewer than 3 large snags per acre in dry upland forests in either the project area or across the forest as a whole, the plaintiffs argue the Forest Service cannot fulfill its obligation to preserve enough habitat for primary cavity excavators.

The defendants submit the plaintiffs have misinterpreted the FEIS.  As the defendants point out, the entire Project affects 3,900 acres of land, which is less than one percent of the forested land that is located within the Umatilla National Forest.  Within dry upland forest, commercial logging will take place on 926 acres of land.  In the near term, logging likely will result in fewer large snags on those 926 acres.  That is a matter of concern.  However, the fact "'a proposed project involves some disturbance to the forest does not prohibit the Forest Service from assuming that maintaining a sufficient amount of suitable habitat will maintain a species' viability.'" *Castenada*, 574 F.3d at 663 (quoting *Lands Council v. McNair*, 537 F.3d 981, 997 (9th Cir.2008) (en banc)).  As the defendants observe, any diminution of snag habitat on the 926 acres in question will be offset by the presence of snag habitat across the forest as a whole.  The FEIS states, "Forest wide, snag densities are similar to reference values (Mason and Countryman 2010).  This would indicate that overall available snag habitat is contributing to viable populations of primary cavity excavators." 3-121 (AR-29268). Finally, the Forest Service insists it is taking steps to preserve

adequate snag habitat.  They include:

> -- studying the manner in which snags are forming in the
> forest;
> -- leaving dense stands of trees in certain locations;
> -- retaining existing snags where possible;
> -- leaving large diameter trees in place;
> -- leaving at least 16 trees per acre;
> -- leaving smaller diameter snags; and
> -- refraining from piling slash against snags when burning
> land in order to protect existing snags.

(Memorandum in Reply (ECF No. 36) at 8-9.)

Given the record as a whole, the plaintiffs' allegation of inadequate snag habitat is unjustified.  Forests within the Project area are unhealthy.  Remedial action is appropriate.  The Forest Service has established a legitimate goal:  Restore unhealthy forests to conditions that existed before settlers began arriving during the middle of the nineteenth century.  The Forest Service is aware the process of restoration will affect snag habitat.  The Forest Service has designed the Project in a manner that, in the opinion of the Forest Service, will limit the disruption.  Beyond that, the Forest Service has assessed the amount of dry-forest snag habitat that exists in the Project area and across the Umatilla National Forest as a whole.  The data complied by the Forest Service indicates adequate snag habitat exists to maintain the population of primary cavity excavators.  The plaintiffs have failed to demonstrate that the Forest Service's assessment of the data is unreasonable.

**TREE REMOVAL IN RIPARIAN HABITAT CONSERVATION AREA**

The Forest Service is proposing to remove a certain number of

trees from 25 acres of forest that is located in a Riparian Habitat Conservation Area.  Special procedures will be used to remove the trees.  (FEIS at 2-17 (AR-29116).)  Tree removal is governed by provisions that, as explained above, are now commonly referred to as "PACFISH."  The PACFISH provisions were added to the Umatilla National Forest Plan in 1995 via Amendment #10.  Their function is to protect runs of anadromous fish.  "Anadromous fish" are "[f]ish that hatch in fresh water, migrate to the ocean, mature there, and return to fresh water to reproduce[.]"  (Glossary at 2 (AR-29348).)  Salmon and steelhead are familiar examples of anadromous fish.

The Forest Service interprets the Umatilla National Forest Plan as authorizing removal of trees from a RHCA as long as removal satisfies the requirements of the relevant PACFISH standard. Different types of activities are governed by different standards. For example, there are separate standards for timber harvest, road design, grazing, recreation, and forest fire prevention.  ("Interim Strategies for Managing Anadromous Fish-producing Watersheds," Appendix C, at C-10 to C-18 (AR-9139 to AR-9146).)  The plaintiffs argue the proposed tree removal is a type of timber management and, thus, is governed by a timber management standard, *viz.*, TM-1.  (*Id.* at C-10 (AR-9139).)  If so, the Forest Service must demonstrate removal is consistent with either subsection (a) or subsection (b) of TM-1:

> a.  Where catastrophic events such as fire, flooding, volcanic, wind, or insect damage result in degraded riparian conditions, allow salvage and fuelwood cutting in Riparian Habitat Conservation Areas only where present and future

Order - 20

> woody debris needs are met, where cutting would not retard
> or prevent attainment of other Riparian Management
> Objectives, and where adverse effects on listed anadromous
> fish can be avoided.  For watersheds with listed salmon or
> designated critical habitat, complete Watershed Analysis
> prior to salvage cutting in RHCAs.
> b.  Apply silvicultural practices for Riparian Habitat
> Conservation Areas to acquire desired vegetation
> characteristics where needed to attain Riparian Management
> Objectives.  Apply silvicultural practices in a manner that
> does not retard attainment of Riparian Management Objectives
> and that avoids adverse effects on listed anadromous fish.

*Id.*  The plaintiffs have analyzed the tree removal that the Forest
Service is proposing.  According to them, the proposed removal does
not satisfy the requirements of either subsection "a" or "b."
Consequently, they insist removal is prohibited by PACFISH.

The defendants argue TM-1 is inapplicable because the purpose of
the tree removal is not timber management.  Rather, as the defendants
see it, the trees are being removed in order to reduce the risk of a
crown fire occurring along the stream.  (A crown fire is a fire that
spreads across the tops of trees.)  In the defendants' opinion, the
relevant PACFISH standard is FM-1, which governs "Fire/Fuels
Management."  FM-1 states:

> Design fuel treatment and fire suppression strategies,
> practices, and actions so as not to prevent attainment of
> Riparian Management Objectives, and to minimize disturbance
> of riparian ground cover and vegetation.  Strategies should
> recognize the role of fire in ecosystem function and
> identify those instances where fire suppression or fuel
> management actions could perpetuate or be damaging to long-
> term ecosystem function, listed anadromous fish, or

Order - 21

designated critical habitat.
("Interim Strategies for Managing Anadromous Fish-producing
Watersheds," Appendix C, at C-15 (AR-9144).)

The plaintiffs allege FM-1 played no meaningful part in the
Forest Service's decision to remove trees from the RHCA.  Had FM-1
played a meaningful part, say the plaintiffs, it would have been cited
in the Final Environmental Impact Statement; but it was not cited
therein, a point the defendants concede.  According to the plaintiffs,
the clearest explanation of the basis of the Forest Service's decision
to remove trees from the RHCA is contained in "Appendix C" to the
FEIS.  Appendix C addresses whether the Project is consistent with the
Eastside Screens.  As will be recalled, the term "Eastside Screens"
refers to provisions that were added to the Umatilla National Forest
Plan via Amendment #11.  Appendix C states, in part, that the removal
of trees from a RHCA is consistent with the Eastside Screens as long
as removal satisfies the provisions of PACFISH.  (FEIS, Appendix C, at
C-3 (AR-29448).)  As a general rule, there are only two situations in
which the Forest Service may authorize timber harvest activities in a
RHCA:

> 1. For catastrophic events such as fire, flooding, volcanic,
> wind or insect damage (when salvage harvest and fuelwood
> cutting is then allowed if compatible with riparian
> management objectives); and
> 2. When applying silvicultural practices to control
> stocking, reestablish and culture stands, and acquire
> desired vegetation characteristics in a manner that also
> meets riparian management objectives.

(FEIS, Appendix C, at C-3 (AR-29448).)  The Forest Service considered

Order - 22

the extent to which the Project's proposed silvicultural actions would affect RHCAs.  The Forest Service made the following finding in that regard:

> . . .  None of the silvicultural proposed actions (intermediate cutting, regeneration cutting, planting) will occur in any of the riparian habitat conservation areas established by PACFISH (FP amendment # 10).  *Special Exception*:  one specific RHCA location (Red Hill portion of the project area) comprising 24 acres is proposed for treatment (improvement cutting, noncommercial thinning, prescribed fire) as a case study or prototype to examine whether limited RHCA treatments are warranted or advisable in the future (Hanger 2009).

*Id.*  The plaintiffs argue the above-quoted passage undermines the defendants' present reliance upon FM-1.  In the plaintiffs' opinion, the Forest Service recognized the applicability of TM-1 when it prepared the FEIS.  Nevertheless, as the plaintiffs' view the record, the Forest Service decided it could unilaterally set aside the requirements of TM-1 in order to conduct a "case study" which would allow it to determine whether certain types of remedial action would be beneficial.  The plaintiffs concede such a case study could be helpful.  However, they deny the Forest Service has authority to unilaterally set aside the requirements of TM-1 in order to conduct such a study.  In their opinion, the Forest Service must follow established procedure.  If the Forest Service wants to modify the requirements of TM-1, say the plaintiffs, it must pursue an amendment of the Plan that authorizes it to conduct the study in question.

It is true, as the plaintiffs allege and the defendants concede,

that the FEIS does not cite RHCA standard FM-1 by name.  However, nothing in the FEIS suggests trees will be removed from the RHCA as part of a timber management program.  To the contrary, a balanced reading of the FEIS indicates the purpose of tree removal is to reduce the risk of fire.  The following statement in the FEIS is illustrative:

> No harvest will take place in RHCAs which are described
> below as they apply to this project except for two fuels
> treatments areas in RHCAs identified as RHCA units 1 and 2.
> Mechanical thinning will be used on approximately 25 acres
> to remove co-dominant conifers to reduce probability of
> crown fire initiation.

(FEIS at 2-19 (AR-29118).)  Looking at the FEIS as a whole, the Forest Service's perspective is reasonably clear.  The Forest Service never intended to remove trees from the RHCA as part of a timber management program.  To the contrary, the Forest decided to remove the trees as a form of Fire/Fuels Management.  This accurately characterizes the Forest Service's position even though the Forest Service did not cite FM-1 in the FEIS.  Thus, contrary to the plaintiffs, the Forest Service's reliance upon FM-1 at this juncture in the proceedings does not constitute an after-the-fact attempt to shore up its decision by invoking a new rationale.

The Forest Service maintains it has authority under the Umatilla National Forest Plan to remove trees from a RHCA; provided, of course, the project is consistent with the provisions of the relevant PACFISH standard.  The plaintiffs deny that FM-1 is the relevant standard and that the Forest Service relied upon FM-1 in designing the Project, but

Order - 24

they concede the Forest Service is authorized to remove trees from a RHCA without violating the Umatilla National Forest Plan as long as the Forest Service complies with the relevant PACFISH standard.  As explained above, the Forest Service's decision to remove trees from the RHCA is not an aspect of timber management.  Rather, it is part of an effort to reduce the risk of a crown fire along a stream in the RHCA.  Consequently, FM-1 is the PACFISH standard the Forest Service must satisfy.

The first sentence of FM-1 states, "Design fuel treatment and fire suppression strategies, practices, and actions **so as not to prevent attainment of Riparian Management Objectives**, and to minimize disturbance of riparian ground cover and vegetation."  ("Interim Strategies for Managing Anadromous Fish-producing Watersheds," Appendix C, at C-15 (AR-9144).)  (Emphasis added.)  The FEIS defines the term "Riparian Management Objectives."  They are "[q]uantifiable measures of stream and stream-side conditions that define good anadromous fish habitat, and serve as indicators against which attainment, or progress toward attainment, of the goals will be measured."  (Glossary at 16 (AR-29362).)  PACFISH establishes Riparian Management Objectives ("RMOs") for streams in a Riparian Habitat Conservation Area.  The RMOs address critical attributes of a typical stream, *viz.*, pool frequency, water temperatures, large woody debris, bank stability, lower bank angle, and width/depth ratio.  ("Interim Strategies for Managing Anadromous Fish-producing Watersheds," Appendix C, at C-6 (AR-9135).)

The plaintiffs are concerned about the temperature of water in

Order - 25

George Creek.  They allege that removing trees from the area that borders the unnamed tributary of George Creek will reduce shade and that this will, in turn, increase the water temperature of the tributary.  The plaintiffs fear the tributary will feed warmer water into George Creek, thereby increasing the temperature of George Creek to the detriment of anadromous fish.  This is a serious concern, one the Forest Service has considered.  (FEIS at 3-21, 3-22 (AR-29168, AR-29169)).  The Forest Service is taking steps to limit the risk of a temperature increase in the tributary.  For example, aquatic specialists will be present when trees are marked for removal.  Overstory trees will be protected, and bank-and-channel stabilizing trees will remain uncut.  (*Id.* at 2-19, Table 2-5 (AR-29118)).  Furthermore, the Forest Service has assessed the risk that warmer water will flow into George Creek from the tributary and affect anadromous fish.  As the Forest Service notes, a "[d]ry channel and subterranean flows occur between the project site and steelhead habitat." (FEIS, Appendix K, at K-213 (AR-29771).)  This circumstance may limit the risk that warm water will flow into George Creek.  There is at least one other mitigating circumstance.  The period of greatest risk will occur during the middle of summer when the sun beats down on the area.  However, during the middle of the summer, water from the tributary makes up about one quarter of the flow of George Creek at the confluence of the two streams.  (FEIS at 3-22 (AR-29169).)  Given the totality of the circumstances, the Forest Service determined "it is unlikely that there would be a measurable water temperature increase in George Creek from the RHCA fuels treatment[.]"  *Id.*

The plaintiffs are not so sanguine.  It will be many years, they note, before trees along the unnamed tributary grow to the point they provide as much shade as existing trees currently provide.  In the meantime, the temperature of the water in the unnamed tributary can be expected to increase.  How much will the water warm, and will warmer water enter George Creek?  The plaintiffs are concerned.  As they point out, the temperature of George Creek already is above the Riparian Management Objective for water temperature.  Even a small increase in temperature will impede the attainment of the relevant RMO for George Creek.  This may not constitute an egregious violation of PACFISH, but, according to the plaintiffs, there is no exception for de minimis violations.  *Cf. Oregon Natural Resources Council Fund v. Goodman*, 505 F.3d 884, 895 (9th Cir.2007) ("Whether the acreage at issue is relatively large or small is irrelevant to this inquiry-relevant law contains no de minimis exceptions.").

The plaintiffs' concerns about water temperature are not frivolous.  They reflect a careful review of the scientific data that the Forest Service has accumulated.  However, the plaintiffs are not the only ones who are paying attention to water temperature.  The Forest Service is equally attentive.  For example, the Forest Service is aware that removing trees along the tributary will reduce shade and potentially increase the temperature of the tributary.  The Forest Service has taken steps to limit the risk.  Similarly, the Forest Service is aware that the tributary flows into George Creek.  The Forest Service has assessed the risk that warmer water will flow from the tributary into George Creek.  As explained above, the Forest

Service cites several circumstances that, in its opinion, limit the risk.

Both the plaintiffs and the Forest Service want to attain the Riparian Management Objectives for George Creek.  However, they disagree as to the best method for doing so.  The Forest Service has concluded that removing trees from the RHCA is necessary.  In reaching that conclusion, the Forest Service engaged in a thoughtful analysis of a substantial body of scientific data.  The analysis required a high level of technical expertise.  Where "analysis of scientific data requires a high level of technical expertise, courts must defer to the informed discretion of the responsible federal agencies."  *Earth Island Institute*, 697 F.3d at 1020 (internal punctuation and citation omitted).  Deference is especially warranted in this situation because there is no risk-free path forward.  While it is true that removing trees could increase water temperatures and possibly damage anadromous fish, it is also true that leaving the area as it is would increase the risk of a crown fire spreading through the tops of trees that are located along the tributary.  The Forest Service is entitled to consider the costs associated with forest fire in determining whether the risks associated with tree removal are warranted.  The Forest Service decided the balance of risks weighs in favor of tree removal; that, in the long run, removing trees is more likely to attain RMOs than leaving the area as it is.  Reasonable people can disagree with the Forest Service's decision.  However, that does not mean the Forest Service violated the law.  To the contrary, the record reflects the Forest Service has developed a common sense solution to a complex

problem.  The Forest Service's solution is not risk free, but, then again, neither are the alternatives.

**POTENTIAL WILDERNESS AREAS**

The plaintiffs concede the Forest Service considered the existence of potential wilderness areas in assessing the environmental consequences of the proposed Project.  Nevertheless, the plaintiffs allege the Forest Service violated the National Environmental Policy Act by arbitrarily refusing to include any land that is located within 300 feet of a road.  (FEIS, Appendix H, at H-3 (AR-29499).)  The Forest Service made that decision because some areas within 300 feet of a road show signs of logging, *e.g.*, stumps or skid trails or clear cuts.  The Forest Service decided such areas are not suitable for inclusion in wilderness areas.  *See id.*  The plaintiffs acknowledge that some areas within 300 feet of a road do show signs of logging. Nevertheless, there are large swaths of steppe-shrublands along roads that do not show such signs.  By refusing to include any land that is located within 300 feet of a road, say the plaintiffs, the Forest Service arbitrarily failed to consider an important part of the problem of wilderness preservation.

The defendants deny the Forest Service arbitrarily ignored steppe-shrublands.  As they point out, Appendix H to the Final Environmental Impact Statement sets forth the methodology that the Forest Service employed in analyzing potential wilderness area. (FEIS, Appendix H, at H-1 to H-10 (AR-29497 to AR-29506).)  The Forest Service used the procedures that are contained in the Forest Service Handbook ("FSH").  (FEIS, Appendix H, at H-1 (AR-29497).)  The FSH

says that, in establishing boundaries for potential wilderness, it is appropriate to "use semi-permanent human-made features that are locatable on the map and on the ground."  (*Id.* at H-4 (AR-29500) (citing FSH 1909.12, at 71).)  A road is one such feature. Consequently, in the defendants' opinion, the Forest Service did not act arbitrarily in drawing a boundary that parallels existing roads. Nor, in the defendants' opinion, did the Forest Service act arbitrarily in excluding all land within 300 feet of existing roads whether or not the land shows signs of logging.  The Forest Service expressly recognized that "stumps are not present along every mile of forest road[.]"  (FEIS, Appendix H, at H-3 (AR-29499).)  Nevertheless, the Forest Service chose a 300-foot buffer because, in its judgment, the buffer would make it easier to identify potential wilderness areas.

The plaintiffs do not think the Forest Service needed to use an arbitrary 300-foot buffer in order to exclude land that shows signs of logging.  According to the plaintiffs, less arbitrary methods exist. They submit, by way of illustration, that Forest Service employees could have examined maps and aerial photographs, and, if questions remained about a particular stretch of road, the employees could have visited the area.  By using such a process, say the plaintiffs, the Forest Service could have excluded areas that show signs of logging without also excluding vast swathes of steppe-shrublands.

The plaintiffs' criticism of the 300-foot zone is unpersuasive. To begin with, one must consider the costs associated with the method of boundary identification proposed by the plaintiffs.  It seems

likely their method would be more time consuming.  The plaintiffs do not think the burden will be oppressive, but the burden will not fall on them.  It will fall of the Forest Service.  The Forest Service is entitled to great deference in deciding how to allocate its employees' time.

There is a second reason the plaintiffs' criticism is unpersuasive.  As will be recalled, they complain the 300-foot zone will result in the arbitrary exclusion of steppe-shrublands from potential wilderness area.  The record is otherwise.  An environmental group named Oregon Wild asked the Forest Service to consider designating a 3,970-acre polygon within the South George project planning area as potential wilderness area.  Oregon Wild submitted a map that, interestingly, did not exclude land within 300 feet of roads.  (FEIS, Appendix I, Map I-OW-1 (AR-29528).)  The Forest Service examined Oregon Wild's proposal and determined it did not meet the relevant criteria.  The plaintiffs do not allege the Forest Service's decision was arbitrary.  If the area proposed by Oregon Wild did not meet the relevant criteria, what other area would?  In other words, is there some area within the Project area that would qualify as potential wilderness area if only the Forest Service included steppe-shrublands that lie within 300 feet of a road?  If there is such an area, the plaintiffs have not identified it.

**SUMMARY OF ANALYSIS**

The Forest Service has decided to proceed with the South George Vegetation and Fuels Management Project.  The Project has a number of components.  Timber will be commercially harvested on approximately

3,900 acres of land.  In addition, the Forest Service will remove
trees that are likely to fall on roads, burn approximately 3,000 acres
of land, and thin approximately 25 acres of forest that is located in
a Riparian Habitat Conservation.  The plaintiffs allege the Project
violates both the National Forest Management Act and the National
Environmental Policy Act.  The Court has authority, under the
Administrative Procedure Act, to consider the plaintiffs' allegations.
However, review is narrow.  *Earth Island Institute*, 697 F.3d at 1014
(internal punctuation and citation omitted).  The Court may not enjoin
any part of the Project unless the plaintiffs prove the Forest Service
behaved in a manner that is "arbitrary, capricious, an abuse of
discretion, or otherwise not in accordance with law[.]"  5 U.S.C. §
706(2)(A).

A. Snag Habitat

The plaintiffs allege the Umatilla National Forest Plan
incorporates the 1982 rule at the project level.  That being the case,
say the plaintiffs, the Forest Service must demonstrate there is
enough snag habitat in dry upland forest in the Project area in order
to maintain the population of primary cavity excavators.  The
plaintiffs argue that, since there are fewer than 3 large snags per
acre, on average, in dry upland forests in the Project area or, for
that matter, across the Umatilla National Forest as a whole, the
Forest Service cannot fulfill its obligation to preserve enough
habitat for primary cavity excavators.  The plaintiffs' allegations
are contradicted by the record.  First, the Plan does not incorporate
the 1982 rule's viability requirements at the project level.  To the

Order - 32

contrary, the Plan incorporates them at the national forest planning level.  As a result, the Forest Service may satisfy its obligations under the National Forest Management Act by demonstrating there is enough snag habitat in dry upland forest across the Umatilla National Forest in order to maintain the population of primary cavity excavators.  Second, the plaintiffs have misinterpreted the significance of the Forest Service's decision to retain three large snags per acre on the 926 acres of dry upland forest that will be subject to commercial logging.  Retaining three snags per acre will promote habitat for primary cavity excavators, but the Forest Service has determined it is unnecessary to have three large snags per acre on the 926 acres in question in order to maintain the population of primary cavity excavators.  In the opinion of the Forest Service, there is adequate habitat across the national forest as a whole.  The plaintiffs have failed to establish this determination "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Confederated Tribes*, 342 F.3d at 928 (internal citation omitted).  Thus, the Forest Service's decision to harvest timber in dry upland forest is consistent with the Umatilla National Forest Plan and the National Forest Management Act.

B. Tree Removal in a Riparian Habitat Conservation Area

The plaintiffs allege the Forest Service's decision to remove trees from a Riparian Habitat Conservation Area is a form of timber management.  The plaintiffs are incorrect.  The Forest Service designed this part of the project in order to reduce the risk of a crown fire spreading through the tops of trees that are growing near

an unnamed tributary to George Creek.  Although the FEIS does not cite FM-1 by name, a balanced reading of the FEIS reveals that this part of the project addresses fire/fuels management rather than timber management.  Consequently, the removal of trees along the tributary should be evaluated under FM-1.  The plaintiffs are concerned that removing trees in the RHCA will expose more of the stream to sunlight and this will, in turn, lead to an increase in temperature of the water in the stream.  The Forest Service considered this issue and designed the project in a manner calculated to reduce the risk of an increase in water temperature.  Moreover, the Forest Service assessed the risk that warmer water will flow from the unnamed stream into George Creek and injure anadromous fish.  The Forest Service determined that the removal of trees along the tributary is unlikely to produce a measurable increase in the temperature of George Creek. The Forest Service's determination is entitled to deference.  *See, e.g., Earth Island Institute*, 697 F.3d at 1020 ("'[b]ecause analysis of scientific data requires a high level of technical expertise, courts must defer to the informed discretion of the responsible federal agencies'" (quoting *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1301 (9th Cir.2003))).  The plaintiffs have engaged in a thoughtful critique of the Forest Services' analysis of the relevant data.  Nevertheless, they have failed to demonstrate the Forest Service's analysis "runs counter to the evidence." *Confederated Tribes*, 342 F.3d at 928 (internal citation omitted).  Finally, leaving the trees in place poses risks of its own.  The area in question is becoming increasingly vulnerable to fire.  Undoubtedly, a fire would

retard the attainment of Riparian Management Objectives.  By contrast, taking environmentally responsible steps to avoid a fire will help attain RMOs.  It follows that removal of the trees from the RHCA does not violate either the Eastside Screens or PACFISH, which is to say removal does not violate the National Forest Management Act.

        C. Potential Wilderness Areas

        The plaintiffs allege the Forest Service's decision to exclude all land that is located within 300 feet of a road from potential wilderness areas, whether or not the land shows signs of logging, will result in the arbitrary exclusion of steppe-shrublands from potential wilderness areas in violation of National Environmental Policy Act. The plaintiffs think there is a better way to identify the boundaries of potential wilderness areas.  They suggest Forest Service employees examine maps and, when maps do not provide adequate guidance, personally inspect the area in question.  The plaintiffs' proposal is not unreasonable.  Indeed, if the Forest Service had greater resources, the Forest Service might adopt it; but, the fact remains the Forest Service's resources are limited.  It must take reasonable steps to conserve them.  Here, the Forest Service relied upon the Forest Service Handbook.  The FSH recommends using semi-permanent features, such as roads, to establish boundaries.  The Forest Service did that.  Consequently, its reliance upon an easy-to-administer rule of boundary identification was not arbitrary.  The 300-foot zone does not violate NEPA.  Nor, contrary to the plaintiffs, did the Forest Service ignore the presence of steppe-shrublands in the Project area. They figured significantly in the proposal that Oregon Wild submitted

to the Forest Service.  As observed earlier, Oregon Wild's proposal did not exclude land that is located within 300 feet of roads.  The Forest Service considered Oregon Wild's proposal, concluding it did not satisfy the relevant criteria for potential wilderness area.  The Forest Service's response to Oregon Wild's proposal is characteristic of its overall approach to potential wilderness area.  The Forest Service took a hard look at the issue.  In doing so, it fulfilled its obligations under NEPA.

**IT IS HEREBY ORDERED:**

1. The plaintiffs' motion for summary judgment (**ECF No. 22**) is **denied.**

2. The defendant intervenors' motion for summary judgment (**ECF No. 28**) is **granted.**

3. The United States Forest Service's motion for summary judgment (**ECF No. 31**) is **granted.**

4. The plaintiffs' complaint is dismissed with prejudice.

**IT IS SO ORDERED.**  The District Court Executive is hereby directed to file this order, enter judgment accordingly, furnish copies to counsel, and close the case.

**DATED** this ___6th___ day of January, 2014.

_____s/ Fred Van Sickle_____
Fred Van Sickle
Senior United States District Judge
